**In re BABY GIRL DOE, a.k.a. Baby Girl N., d.o.b. 10/10/01.**

[Cite as *In re Baby Girl Doe*, 149 Ohio App.3d 717, 2002-Ohio-4470.]

Court of Appeals of Ohio,
Sixth District, Lucas County.

No. L–02–1027.

Decided Aug. 30, 2002.

Sarah A. McHugh, for appellants Natalie, Mary Ann, and Edwin N.

Renisa A. Dorner and Christy L. Cole, for appellant Kevin W.

Patricia J. Clark, for appellee.

---

PETER M. HANDWORK, Judge.

{¶ 1} This is an appeal from a judgment of the Lucas County Court of Common Pleas, Juvenile Division, which granted permanent custody of Baby Girl Doe, a.k.a. Baby Girl N. ("the baby"), born October 10, 2001, to the Lucas County Children Services ("LCCS"). For the reasons stated herein, this court affirms the judgment of the trial court.

{¶ 2} Appellants Natalie and Mary Ann and Edwin N., the parents of the birth mother ("Natalie's mother" and "Natalie's father," respectively), set forth the following seven assignments of error:

{¶ 3} "1. The trial court erred when it terminated appellant's parental rights in violation of her due process rights guaranteed under the Fourteenth Amendment of the United States Constitution.

{¶ 4} "2. The trial court erred in determining that there was clear and convincing evidence to support its decision to grant LCCS permanent custody of Baby Doe N. pursuant to O.R.C. 2151.414.

{¶ 5} "3. The trial court erred when it found that LCCS made a good faith effort to implement a Comprehensive Reunification Plan.

{¶ 6} "4. The trial court erred in permitting a waiver of the minor mother's parental rights.

{¶ 7} "5. The minor mother received ineffective assistance of counsel, as counsel's errors were so serious that the minor mother did not receive the guarantee of the Sixth Amendment.

{¶ 8} "6. The trial court abused its discretion in denying appellants' motion to continue an adjudication hearing when the parties and counsel had only one day's notice and the parties' counsel could not attend the hearing.

{¶ 9} "7. The nunc pro tunc order was used for a purpose other than its intended use. Additionally, the nunc pro tunc entry was never served upon appellants or their counsel therefore violating appellants' due process rights."

{¶ 10} Appellant Kevin W. sets forth the following seven assignments of error:

{¶ 11} "A. All parents have a Constitutional right to direct the care, custody and control of their children and such right is violated when a father's parental rights are terminated because he showed a commitment to his daughter by planning for her future.

{¶ 12} "B. A father's consideration of a private open adoption with a specific family does not constitute clear and convincing evidence that his parental rights should be terminated nor does it evidence a lack of commitment to his child.

{¶ 13} "C. An individual with substantial experience and training in the adoption laws and juvenile laws pertaining to state agencies who present[s] testimony beyond the knowledge of laypersons must be considered by the trial court as an expert.

{¶ 14} "D. State agency fails to take reasonable efforts to reunify a child with her family when it ignores the efforts and wishes of a father and his family who never abused or neglected the child.

{¶ 15} "E. The movement of a three-month-old infant from a foster home to her permanent parental home is in the best interests of the child.

{¶ 16} "F. Father is denied effective assistance of counsel when his counsel fails to request discovery from a state agency which evidences the lack of efforts made on the part of the state agency and further evidences the biased nature of the state agency.

{¶ 17} "G.  A court, through one magistrate, cannot, by nunc pro tunc order, change an order of a different magistrate without notifying the interested parties."

{¶ 18}  The following facts are relevant to this appeal.  On October 10, 2001, the baby was found in a plastic bag in a trash dumpster at an apartment complex in Sylvania, Ohio. The baby was found by a woman living in the apartment complex who went to put trash in the dumpster and heard a faint cry;  she observed a plastic bag moving inside the dumpster;  she tore a hole in the bag and saw the baby with its umbilical cord wrapped around its neck;  the plastic bag was tied very tightly.  The police were contacted and they transported the baby to a hospital, where it was admitted with hypothermia.

{¶ 19}  According to a police report, on October 14, 2001, the police were contacted by Natalie's father, who stated that he believed that his daughter Natalie, sixteen years old at the time, was the baby's mother.[1]  According to medical records, on October 13, 2001, Natalie was admitted to the hospital with a vaginal laceration highly suspicious for childbirth.  On October 15, 2001, following repair of the laceration, Natalie was discharged from the hospital and admitted to another hospital for psychiatric care.  On October 15, 2001, the police contacted the parents of the alleged father, appellant Kevin W., a college student.  Kevin contacted the police that same day and told the police that on September 28, 2001, he confronted Natalie about the rumors that she was pregnant, but she denied them and said that she had just gained weight.

{¶ 20}  On October 15, 2001, the day the baby was to be discharged from the hospital, LCCS filed a complaint in dependency, neglect, and abuse, as well as a complaint in original permanent custody pursuant to R.C. 2151.353(A)(4) and 2151.414, reasonable-efforts bypass and a motion for a shelter-care hearing. LCCS stated in the complaint that the identity or whereabouts of the parents were not known.  At the conclusion of the shelter-care hearing, the magistrate granted temporary custody of the baby to LCCS;  an attorney and a guardian ad litem ("GAL") were appointed for the baby.

{¶ 21}  On October 31, 2001, LCCS sought affidavits for service by publication pursuant to R.C. 2151.29 because the parents of the baby were unknown to LCCS. On November 6, 2001, publication summons were issued for a permanent custody hearing to be held on November 15, 2001.

{¶ 22}  The GAL submitted her report and recommendation on November 13, 2001.  In her report, the GAL noted that Natalie had been identified through DNA testing as the baby's mother but was unreachable because she was still

---

1.  On October 23, 2001, DNA test results were that there was a 99.9368 percent probability that Natalie was the baby's mother.

confined to the hospital. The GAL indicated that a possible father had come forward but that this was being investigated by the police. The GAL reported that she had spoken to Natalie's father and he indicated that Natalie, he, and his wife, Natalie's mother, agreed that it would be in the baby's best interest to be placed for adoption. After noting that the mother and her parents had expressed no interest in keeping or caring for the baby, that the alleged father had also expressed his interest in finding a good home for the baby, and that the baby has bonded with the foster mother, the GAL recommended that permanent custody be awarded to LCCS.

{¶ 23} A pretrial hearing scheduled for November 15, 2001, was rescheduled for November 27, 2001. A journal entry noted that LCCS had just become aware of the names of the necessary parties. LCCS was granted leave to file an amended complaint indicating that the birth mother was Natalie and that the alleged father was Kevin; service was requested upon Kevin, Natalie, and her parents. On November 16, 2001, an attorney entered an appearance as counsel for Kevin. On November 21, 2001, summons were issued for all appellants for the pretrial on November 27, 2001, and a hearing on December 5, 2001. Personal service was obtained on Kevin, Natalie, and her parents on November 26, 2001.

{¶ 24} At the pretrial hearing on November 27, 2001, counsel for Kevin was present. The magistrate indicated on the record that counsel for Natalie and her parents could not be present and, although counsel had requested a continuance, the magistrate denied the continuance. Potential witnesses and exhibits for the trial were discussed and the adjudication hearing set for December 5, 2001, was confirmed.

{¶ 25} At the adjudication hearing on December 5, 2001,[2] the baby was adjudicated a dependent, neglected, and abused child. In its judgment entry, the trial court noted that although served, Natalie and her parents failed to make an appearance and that Natalie's attorney waived her appearance.

{¶ 26} On December 28, 2001, Kevin and Natalie filed a joint motion for court consent for adoption. In their motion, they indicated that they had agreed to make an adoptive parenting plan for the baby; that they had filed their application for placement with the Lucas County Court of Common Pleas, Probate Division, per probate court requirements; and that they, their parents, and the prospective adoptive parents had mutually developed an adoptive parenting plan for the baby. LCCS filed a request to deny this motion on the grounds

---

2. At the hearing on December 5, 2001, LCCS noted that Kevin needed to establish whether he was the baby's father. On December 26, 2001, DNA test results were that there was a 99.9292% probability that Kevin was the baby's father.

that pursuant to R.C. 2151.23(A), the juvenile court had exclusive jurisdiction because the baby had been adjudicated a dependent, neglected, and abused child.

{¶ 27} On January 9, 2002, the GAL filed her report and recommendation in which she stated the following in regard to the baby: (1) that the baby appeared quite content; (2) that she was very aware of her surroundings; (3) that she followed the foster mother with her eyes; and (4) that she cried when she could not see the foster mother and stopped as soon as the foster mother returned to her vision. The GAL reported that on November 23, 2001, she met with Kevin and Natalie and their parents; the GAL stated that Natalie did not speak to her on that day and has never discussed anything with the GAL. The GAL also noted that Natalie has had no contact with the baby.

{¶ 28} The GAL also reported that on December 19, 2001, she visited with Kevin at the foster home. During that visit, Kevin told her that he had swim-team training from December 27, 2001, through January 10, 2002, and would be unable to attend any future scheduled visits with the baby. She reported that Kevin told her that he liked the foster parents "very much," although his parents wanted a home for the baby that was stronger in their religious beliefs and faith. Kevin also told her that his mother had talked about moving to the town in which his college was located so that she could live with Kevin and help him take care of the baby while he attended college. Kevin expressed his concern about this arrangement and wondered whether he would be able to complete his education and pursue his chosen career if he had to care for a baby too. The GAL noted that Kevin attended a total of six visits with the baby between December 15 and December 26, 2001.

{¶ 29} The GAL noted in her report that on November 23 and December 21, 2001, she met with two different prospective adoptive couples in meetings with the parents and grandparents of the baby. Following the December meeting, the GAL was informed that the maternal and paternal families wished to pursue adoption with the prospective adoptive couple from the December meeting.[3]

{¶ 30} The GAL reported that she had spoken with Kevin's father, who told her that he and his wife would like to see the baby placed in the home of the prospective adoptive couple selected by him and his wife due to their strong religious belief and background. He further told the GAL that if this placement were not possible, his family would then be willing to take custody of the baby.

{¶ 31} The GAL concluded that it was in the baby's best interest to remain in her present foster home, noting the attachment and bonding between the baby and the foster parents. The GAL further concluded that Kevin really did not

---

3. On January 10, 2002, these prospective adoptive parents filed a motion to intervene. The motion was denied at the disposition hearing.

want the responsibility of caring and providing for the baby, noting his choice to leave Toledo for swim-team training and not visit with the baby. She also noted that Natalie's parents expressed no desire to visit the baby until a private adoption seemed unlikely. The GAL also noted that even after filing a motion for custody on November 17, 2001, the paternal grandparents did not ask to see the baby until on or about December 22, 2001. The GAL recommended that permanent custody be awarded to LCCS and that the baby's placement remain unchanged unless absolutely necessary.

{¶ 32} On January 11, 2002, this case proceeded to trial on the motion for permanent custody. LCCS presented the following testimony.

{¶ 33} The ongoing LCCS caseworker responsible for the case since October 16, 2001, when LCCS had received temporary custody, testified that she received information on October 29 that Natalie was the baby's mother. The caseworker testified that she met Natalie and her parents and the foster parents at a restaurant on November 14; the meeting had been arranged by the GAL because Natalie and her parents expressed an interest in meeting the foster parents who were possible adoptive parents for the baby. The caseworker also testified that she did not remember Natalie's asking about the baby's health or well-being at this meeting. The caseworker testified that prior to this November meeting, Natalie had not contacted her to request a visit with the baby. The caseworker testified that Natalie and her parents expressed that they felt that adoption was what they wanted for the baby. The caseworker testified that Natalie and her parents had not requested that the caseworker bring the baby to this meeting; that the caseworker has not received any calls from either Natalie or her parents asking about the baby's health or well-being; that there have been no visits between Natalie and the baby; that Natalie has not requested visitation; that Natalie has not sent any letters, notes, or gifts to the baby; and that neither Natalie nor her parents visited the baby in the hospital. The caseworker also testified that Natalie has been bound over as an adult on attempted murder and child-endangering charges. The caseworker testified that neither Natalie nor her parents attended the pretrial hearing or the adjudication in this case.

{¶ 34} In regard to Kevin, the caseworker testified that she received Kevin's name on October 18, 2001, and an E-mail address on November 1, 2001, from the detective involved in the criminal investigation. She testified that Kevin did not visit the baby in the hospital, that she E-mailed him the day she received his E-mail address and that he responded on November 2, 2001, and that they set up a time for a telephone conversation on November 5, 2001. During the telephone conversation on November 5, 2001, in response to discussing establishing paternity, Kevin stated that he felt sure that he was the father but that he was not sure that he was going to take a paternity test; that there might be criminal charges

pending against him; that he was not sure what he was going to do; that he was not ready to be a father; and that he felt adoption would be appropriate. During this conversation, Kevin did not indicate any interest in raising the baby himself.

{¶ 35} The caseworker testified that she did not hear from Kevin until the adjudication hearing on December 5, 2001; that he did not request any visits with the baby from their first contact through the date of the adjudication hearing; that after the adjudication hearing on December 5, 2001, Kevin's attorney requested a visit; that the caseworker spoke with Kevin but that he could not visit then because he had to go back to college and that he would be back in Toledo on December 14, 2001. She testified that Kevin did not contact her asking about the baby's health or well-being. The caseworker testified that Kevin attended six visits with the baby between December 14, and December 26, 2001, when he left Toledo for swim training; Kevin had no further visitation with the baby, and the caseworker did not receive any calls or E-mails from him asking about the baby's health or well-being. The caseworker also testified that she met with Kevin on December 21, 2001, at his parents' home. During this visit, Kevin did not express any desire to provide for the baby.

{¶ 36} In regard to the foster home, the caseworker testified that this particular foster home is both a foster home and a legal-risk home; the caseworker explained that a legal-risk home is a family that is not only licensed as a foster home but also the family has adoptive home-study approval. Thus, if a child is made available via permanent custody to LCCS, the child could stay in that same home and be adopted by that family. The foster family was identified on October 12, 2001; the foster mother visited the baby that day and every day thereafter until the baby was discharged; the foster mother fed, changed, held, and touched the baby, staying for several hours each time. This particular foster family was awarded foster parent of the month in August 2001; they belong to the foster parents' association and volunteer at all of the foster-care functions. The caseworker testified that the baby is flourishing with the foster family and appears to be very bonded with the foster family. The caseworker also testified that the foster family has taken measures to protect the baby's privacy and have not told extended family or friends or other foster families about the baby's abandonment.

{¶ 37} The caseworker recommended that LCCS be awarded custody because the parents have stated and shown that they feel that adoption is in the baby's best interest, that they have not shown a desire to raise the baby as their own, and that the baby is doing very well with the foster family.

{¶ 38} On cross-examination, the caseworker testified that she did not believe that it was an important factor for an adopted child to have its parents involved in the adoption process. She also testified that during a visit to Kevin's parents'

home, his mother showed her a room prepared in case they might decide to take the baby. The caseworker also testified that Kevin's swim training in December, when he left Toledo and did not continue visits with the baby, was optional, not required.

{¶ 39} On redirect, the caseworker testified that the actions of the birth parents in meeting with prospective adoptive couples was consistent with their actions and words in demonstrating a lack of commitment to raising the baby themselves.

{¶ 40} The GAL testified that she was unable to contact Natalie because she was in the hospital; she spoke with Natalie's father in November 2001, and he told her that they wanted to be assured that the baby was in a safe home and that they were willing to cooperate in any way to have the baby adopted out. The GAL testified that she facilitated a meeting between Natalie and her parents and the foster parents. The GAL also testified that Natalie's mother called to clarify that the GAL was not bringing the baby to this meeting; Natalie's mother told the GAL that Natalie did not want to see the baby. At this meeting, Natalie did not express any concerns about the care the baby was receiving.

{¶ 41} The GAL testified that she attended a meeting with a prospective adoptive couple on November 23, 2001. She also attended another meeting with a second prospective adoptive couple in December. She also testified that she spoke with Kevin and that he did not think that he would be able to care for the baby and attend college at the same time. She also testified that Kevin's father told her that Kevin's family would like the baby placed with the prospective adoptive couple she met in December, but if that was not possible, they were willing to take the baby. The GAL testified that the baby has adjusted very well to the foster family and that she is visibly aware of the foster mother, following her when she comes into the room. The GAL recommended that it was in the baby's best interest to remain in the present home and that permanent custody be awarded to LCCS.

{¶ 42} Nancy Burley, a licensed independent social worker who has worked in adoption since 1986 and established a state-licensed adoption agency in 1992, was called to testify by Natalie and her parents. Burley testified that she has been involved in adoption reform legislation, that she is a writer for the state-required training for adoption assessors as well as being a state-certified adoption assessor, and that she has been involved in over a thousand adoptions. She testified that due to the changes in Ohio adoption law, the law now recognizes that it is in the best interest of the child to have the birth parents involved. She also testified that in this particular case it is crucial to involve the birth parents. She testified that bonding with foster parents can be transferred to the adoptive

parents. She also testified that in her professional opinion it is never in the best interest of an adopted child not to know that it is adopted.

{¶ 43} The trial court questioned Burley about the adoption law that she worked on and specifically asked how much of the law was based upon research. She admitted that there was no research.

{¶ 44} Natalie's mother testified that Natalie's family has been discussing options since shortly after learning of the baby's birth, and when it determined that Natalie was comfortable with an adoption, the family decided to pursue a private, open adoption. Natalie's mother testified that Natalie's family is very comfortable with the prospective adoptive couple and that Natalie has given her consent.

{¶ 45} The prospective adoptive couple selected by Natalie, Kevin, and their parents testified. The prospective adoptive mother testified that she and her husband are very comfortable with the level of involvement of the birth families in this adoption. She testified that they have completed a home study and have filed a petition for adoption in the probate court. On cross-examination, she agreed that Natalie and Kevin were going to consent to surrendering their parental rights on the following Monday. The prospective adoptive father testified that he felt that the involvement of the biological family was important in his raising of the baby. He testified that he was adopted when he was eight months old; he spent the first eight months in a foster home.

{¶ 46} Kevin testified that the day before he left for college, he had been told of rumors that Natalie was pregnant; and that he contacted her, but she denied that she was pregnant. When he continued to hear the same rumors, he confronted her when he was in Toledo at the end of September. Natalie denied that she was pregnant and said that she had gained weight. He testified that he learned that he was a father on October 15 when a police officer called his mother. Kevin testified that the caseworker contacted him via E-mail and that he spoke with her on November 25 and they discussed the baby's condition. He also testified that he had considered various options in regard to custody, including his mother's moving to where he goes to college and assisting him to care for the baby. He testified that he would prefer that custody be awarded to the prospective adoptive couple and that if the baby could not be with them, it would be in the baby's best interest to be with him.

{¶ 47} On cross-examination, Kevin admitted that he did not take any action to find out where the baby was in foster care between October 15 when he learned he was a father and November 25 when he spoke with the caseworker. He admitted that he was home in Toledo for his college Thanksgiving break but did not contact the caseworker about visiting the baby and he did not contact the caseworker about how the baby was doing.

{¶ 48} Kevin's mother testified that she wants the best for the baby and wants to be sure that the baby is taken care of. She testified that in exploring options, they have examined portfolios of different potential adoptive couples. She also testified that they have looked at apartments where Kevin goes to college, where they could live if custody of the baby is awarded to Kevin. She testified that she is very comfortable with the prospective adoptive couple.

{¶ 49} On cross-examination, Kevin's mother admitted that she did not call LCCS to find out where the baby was in foster care or about the baby's health until after filing a motion for custody in December, even though Kevin had told his parents of the rumors of Natalie being pregnant in September, and the police were investigating Kevin as the baby's father in October. She admitted that the spiritual needs of the baby were paramount to her and the fact that the foster parents did not attend church was a problem for her. She also admitted that if the court awarded Kevin custody and things did not work out, they had discussed the option of adoption later.

{¶ 50} The GAL stated that after listening to the testimony, she had not changed her opinion as expressed in her report that it was in the best interest of the baby for permanent custody to be awarded to LCCS. She also stated that the baby's placement should remain unchanged unless absolutely necessary.

{¶ 51} On January 14, 2002, a judgment entry was entered. The trial court noted that the baby had been adjudicated a dependent, neglected, and abused child on December 5, 2001. The trial court denied the joint motion for court consent for adoption filed by Kevin and Natalie as well as the motions for custody filed by Kevin and his parents. The trial court also denied the motion to intervene filed by the prospective adoptive couple selected by appellants. The trial court awarded permanent custody of the baby to LCCS and terminated the parental rights of Natalie and Kevin.

{¶ 52} On January 16, 2002, a nunc pro tunc order was filed in regard to the judgment entry filed on October 17, 2001, following the October 15, 2001 shelter-care hearing. The same magistrate who conducted the shelter-care hearing filed the nunc pro tunc order. The magistrate noted that in the October 17 judgment entry he marked the wrong box. In the nunc pro tunc order, the magistrate stated that in the judgment entry filed on October 17, 2001, he marked "placement with relative is appropriate" when he should have marked "placement with relative is under investigation." On January 31, 2002, appellants filed separate notices of appeal. This court will address the assignments of error filed by appellants in an order different than presented by appellants and will discuss some assignments of error filed separately together because they are interrelated.

{¶ 53} This court will first address the sixth assignment of error asserted by Natalie and her parents in which they argue that the trial court erred in denying a motion to continue. This court finds no merit in this assignment of error.

{¶ 54} Natalie and her parents challenge the trial court's denial of their attorney's oral motion for continuance because their attorney[4] could not attend a hearing. Although Natalie and her parents assert that the hearing was an "adjudication," upon review of the record this court has determined that the continuance was requested for a pretrial at which witness names and exhibits were discussed. After careful review of the record, this court concludes that the trial court properly exercised its discretion when it denied the oral motion for a continuance.

{¶ 55} The grant or denial of a motion to continue a hearing is a matter entrusted to the broad discretion of the trial court. *Hartt v. Munobe* (1993), 67 Ohio St.3d 3, 9, 615 N.E.2d 617. Absent an abuse of discretion, an appellate court may not substitute its judgment for that of the trial court. *Pons v. Ohio State Med. Bd.* (1993), 66 Ohio St.3d 619, 621, 614 N.E.2d 748. An abuse of discretion connotes more than a mere error in law or judgment; it implies an arbitrary, unreasonable, or unconscionable attitude on the part of the trial court. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. "A decision is unreasonable if there is no sound reasoning process that would support that decision." *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597.

{¶ 56} This court cannot find that Natalie and her parents were prejudiced by the denial of a continuance of a pretrial hearing, and they have not told us how they were. Additionally, the magistrate confirmed that the information shared at the pretrial would be forwarded to their trial counsel. Therefore, we cannot find that the trial court abused its discretion when it denied the request for a continuance.

{¶ 57} Accordingly, the sixth assignment of error asserted by Natalie and her parents is found not well taken.

{¶ 58} This court will next address the seventh assignment of error asserted by Natalie and her parents with Kevin's seventh assignment of error. In these assignments of error, appellants contend that error was committed in regard to a nunc pro tunc order. The nunc pro tunc order was filed in regard to the judgment entry filed on October 17, 2001, following the October 15, 2001 shelter-care hearing. This court finds no merit in these assignments of error.

---

4. Natalie and her parents were represented by different counsel at the trial court level.

{¶ 59} As noted above, the same magistrate who conducted the shelter-care hearing filed the nunc pro tunc order. The magistrate noted that in the October 17 judgment entry he marked the wrong box. In the nunc pro tunc order, the magistrate stated that in the judgment entry filed on October 17, 2001, he marked "placement with relative is appropriate" when he should have marked "placement with relative is under investigation." Upon review of the transcript of the shelter-care hearing, it is clear that the magistrate found that placement with a relative was not appropriate at that time. The magistrate stated at the hearing:

{¶ 60} "The child has no parent, guardian or custodian at this point in time to which [sic] to provide supervision or care. That placement with a relative is not appropriate at this time. It may be at some point in the future if the Agency can discover the mother and or father."

{¶ 61} The purpose of a nunc pro tunc order is to have the judgment of the court reflect its true action. The power to enter a judgment nunc pro tunc is restricted to placing on the record evidence of judicial action which has actually been taken. *Roth v. Roth* (1989), 65 Ohio App.3d 768, 771, 585 N.E.2d 482. A nunc pro tunc order cannot be used to change a prior judgment entry unless the earlier entry did not reflect what was actually decided by the court. Id. Nunc pro tunc orders are employed to make the record speak the truth, and the function of such entries is the correction of judgments rendered, to the extent that they fail to record, or improperly record, the judgment rendered by the court. *State v. Coleman* (1959), 110 Ohio App. 475, 479, 13 O.O.2d 242, 169 N.E.2d 703. Therefore, nunc pro tunc entries correct judicial errors but are limited to reflecting what the court actually decided, not what the court should have decided or intended to decide. *State ex rel. Litty v. Leskovyansky* (1996), 77 Ohio St.3d 97, 100, 671 N.E.2d 236. Pursuant to the above law, this court finds support for the magistrate's issuance of the nunc pro tunc order.

{¶ 62} Appellants also argue that they were not notified of the nunc pro tunc entry. However, at the time of the issuance of the nunc pro tunc entry, appellants were no longer parties to the action, except for purposes of appeal. R.C. 2151.414(F)[5]; *In re Butkus* (July 14, 1997), Warren App. No. CA97–01–014, 1997 WL 401527.

---

5. {¶ a} R.C. 2151.414(F) provides:

{¶ b} "The parents of a child for whom the court has issued an order granting permanent custody pursuant to this section, upon the issuance of the order, cease to be parties to the action. This division is not intended to eliminate or restrict any right of the parents to appeal the granting of permanent custody of their child to a movant pursuant to this section."

{¶ 63} Accordingly, the seventh assignment of error asserted by Natalie and her parents and Kevin's seventh assignment of error are found not well taken.

■ {¶ 64} This court will next address the fourth assignment of error asserted by Natalie and her parents. In this assignment of error, Natalie and her parents argue that the trial court erred in permitting a waiver of Natalie's parental rights as Natalie's trial counsel should not have been allowed to enter an admission or a waiver of her rights. This court finds no merit in this assignment of error.

{¶ 65} Natalie's trial counsel entered a waiver in regard to Natalie's appearance at the adjudication hearing held on December 5, 2001. Natalie bases her argument in this assignment of error on Juv.R. 29(D).[6] However, Juv.R. 29(D) is not applicable. Juv.R. 29(D) requires that the trial court make certain determinations before accepting an admission from a juvenile. As noted by the appellate court in *In re Etter* (1998), 134 Ohio App.3d 484, 488–489, 731 N.E.2d 694:

{¶ 66} "* * * Juv.R. 29(D) imposes a positive obligation upon the trial court to make certain determinations before accepting an admission from a party. (Citations omitted.) Indeed, Juv.R. 29 *prohibits* a court from accepting an admission from a juvenile unless it addresses the party 'personally.' The purpose of the inquiry is to determine (1) that the admission is voluntary and made with an understanding of the nature of the allegations and the consequences of the admission; and (2) that the party understands that by admitting to the facts he or she is waiving the right to challenge witnesses and evidence against the party, to remain silent, and to introduce evidence at the adjudicatory hearing." (Emphasis in original.)

{¶ 67} In the case sub judice, Natalie's trial counsel waived her appearance at the adjudication. No admission from Natalie occurred in this case. Thus, Juv.R. 29(D) is inapplicable.

{¶ 68} Accordingly, the fourth assignment of error asserted by Natalie and her parents is found not well taken.

---

6. {¶ a} Juv.R. 29(D) provides:

{¶ b} "Initial procedure upon entry of an admission. The court may refuse to accept an admission and shall not accept an admission without addressing the party personally and determining both of the following:

{¶ c} "(1) The party is making the admission voluntarily with understanding of the nature of the allegations and the consequences of the admission;

{¶ d} "(2) The party understands that by entering an admission the party is waiving the right to challenge the witnesses and evidence against the party, to remain silent, and to introduce evidence at the adjudicatory hearing.

{¶ e} "The court may hear testimony, review documents, or make further inquiry, as it considers appropriate, or it may proceed directly to the action required by division (F) of this rule."

{¶ 69}  This court will next address Kevin's third assignment of error. In this assignment of error, Kevin argues that the trial court erred when it failed to consider the expert testimony of Burley in regard to adoption.  This court finds no merit in this assignment of error.

{¶ 70}  Kevin argues in his brief that the trial court did not consider Burley's testimony because the court determined that appellants had not offered Burley as an "expert."  However, that is not what the trial court stated in its judgment entry.  In its judgment entry, the trial court stated:

{¶ 71}  "The Court finds Ms. Burley was not offered as an expert.  The Court asked whether her testimony was based on research.  She stated there was little research to support her position and advice.  She also stated that adoption practitioners are shaping their policies along the lines of what she advocated in her testimony.  The Court considered this witness's testimony, but was not persuaded by it, as to the best interest of this specific child.  Further, the Court relies on ORC 2151.414(C)."

{¶ 72}  It is clear that the trial court considered the testimony of Burley.  The trial court was not, however, persuaded by her testimony.

{¶ 73}  In regard to Kevin's argument that Burley meets the standard to testify as an expert witness, the law is well established.  The determination of whether a witness is qualified to offer testimony as an expert is within the sound discretion of the trial court.  This discretion is not unlimited, but is subject to the provisions of the Rules of Evidence.  Specifically, the expert should possess specialized, technical, or scientific knowledge.  Evid.R. 702[7]; *Columbus v. Dawson* (1986), 28 Ohio App.3d 45, 46–47, 28 OBR 56, 501 N.E.2d 677.  Additionally, the proffered testimony should assist the trier of fact in understanding the evidence or in determining a factual issue and be relevant to the case.  *State v. Williams* (1983), 4 Ohio St.3d 53, 4 OBR 144, 446 N.E.2d 444, syllabus.  As to this latter requirement, the expert's testimony is relevant insofar as it is reliable. *Williams,* supra, at 57–59, 4 OBR 144, 446 N.E.2d 444; *State v. Minor* (1988), 47 Ohio App.3d 22, 25, 546 N.E.2d 1343.  In *State v. Nemeth* (1998), 82 Ohio St.3d 202, 210, 694 N.E.2d 1332, the Ohio Supreme Court noted that the Staff Note to Evid.R. 702 "reinforced the directive that questions of reliability are to be

---

7.  {¶ a}   Evid.R. 702 states:

{¶ b}   "A witness may testify as an expert if all of the following apply:

{¶ c}   "(A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

{¶ d}   "(B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

{¶ e}   "(C) The witness' testimony is based on reliable scientific, technical, or other specialized information.  * * *"

directed at principles and methods used by an expert in reaching his or her conclusions, rather than trying to determine whether the conclusions themselves are correct or credible."

{¶ 74} Under Evid.R. 702, a witness may be qualified as an expert by reason of knowledge, skill, experience, training, or education. While Evid.R. 702 permits expert testimony, a threshold determination must first be made under Evid.R. 104(A)[8] concerning the qualifications of an individual to testify as an expert witness. *Vinci v. Ceraolo* (1992), 79 Ohio App.3d 640, 645–646, 607 N.E.2d 1079. The decision that a witness is or is not qualified to testify as an expert is a matter within the sound discretion of the trial court, and a court's ruling thereon will not be reversed unless there is a clear showing of an abuse of this discretion. *Alexander v. Mt. Carmel Med. Ctr.* (1978), 56 Ohio St.2d 155, 157, 10 O.O.3d 332, 383 N.E.2d 564; *State v. Awkal* (1996), 76 Ohio St.3d 324, 331–332, 667 N.E.2d 960; *State v. Clark* (1995), 101 Ohio App.3d 389, 411, 655 N.E.2d 795.

{¶ 75} Even if the trial court had determined that Burley met the standard to testify as an expert witness, it is also well established that the weight to be given the evidence and the credibility of witnesses are primarily for the trier of fact to decide. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. The trier of fact is not required to believe any witness/expert. The fact finder is free to believe some, all, or none of the testimony of any witnesses. *Domigan v. Gillette* (1984), 17 Ohio App.3d 228, 229, 17 OBR 494, 479 N.E.2d 291; *State v. Harriston* (1989), 63 Ohio App.3d 58, 63, 577 N.E.2d 1144. The trial judge, as trier of fact, is in the best position to weigh evidence and assess witness credibility. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273. This court, therefore, cannot, and will not, substitute our judgment for that of the trier of fact. Id.

{¶ 76} Accordingly, Kevin's third assignment of error is found not well taken.

{¶ 77} This court will next address the first assignment of error asserted by Natalie and her parents. In this assignment of error, Natalie and her parents contend that the trial court violated Natalie's due process rights in that she did not receive adequate notice of the adjudication hearing. This court finds no merit in this assignment of error.

{¶ 78} Upon review of the record in the case sub judice, this court finds that upon learning the identities of appellants, LCCS requested and was granted leave

---

8. {¶ a} Evid.R. 104(A) provides:

{¶ b} "Preliminary questions concerning the qualification of a person to be a witness * * * or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (B). * * *"

to file an amended complaint. The amended complaint was served upon appellants on November 26, 2001, and included notices of the November 27, and the December 5, 2001 hearings. Furthermore, Natalie's trial counsel filed an entry of appearance on November 21, 2001, and contacted the magistrate by telephone to request a continuance of the pretrial hearing set for November 27, 2001.

{¶ 79} Additionally, Natalie failed to object to any alleged defects in the complaint prior to the adjudicatory hearing. As noted by the court in *In re Shaeffer Children* (1993), 85 Ohio App.3d 683, 688, 621 N.E.2d 426:

{¶ 80} "Furthermore, despite the alleged ineffective notice, appellant elected to appear and participate with counsel. As appellant herself notes, there is authority supporting the proposition that such participation waives any objection to the inadequacies of the notice. (Citation omitted.) Finally, we note that appellant did not raise the issue of the adequacy of the notice at the trial level. Juv.R. 22(D) requires that defenses and objections based on defects in the complaint must be heard prior to the adjudicatory hearing."

{¶ 81} Accordingly, the first assignment of error asserted by Natalie and her parents is found not well taken.

{¶ 82} This court will next address the third assignment of error asserted by Natalie and her parents with Kevin's fourth assignment of error. In these assignments of error, appellants argue that the trial court erred when it found that LCCS made a good-faith effort in regard to reunification. This court finds no merit in these assignments of error.

{¶ 83} In the case sub judice, LCCS filed an original custody complaint pursuant to R.C. 2151.353(A)(4). In *In re Baby Girl Baxter* (1985), 17 Ohio St.3d 229, 17 OBR 469, 479 N.E.2d 257, paragraph two of the syllabus, the Ohio Supreme Court held: "R.C. 2151.412 does not require a juvenile court to order a reunification plan when it makes a dispositional order pursuant to R.C. 2151.353(A)(4)." In *In re Demetrius H.* (Mar. 9, 2001), Lucas App. No. L–00–1300, 2001 WL 227053, this court stated:

{¶ 84} "While the trial court did make this finding, it is well-established that where a children services agency seeks original permanent custody of a child pursuant to R.C. 2151.353(A)(4), the agency is not required to establish a case plan. See *In the Matter of Misty B.* (Sept. 17, 1999), Lucas App. No. L–98–1431, unreported [1999 WL 728092]; *In the Matter of Stephanie H.* (Sept. 17, 1999), Huron App. No. H–99–009, unreported [1999 WL 728090]. Accordingly, LCCS was not required to attempt reunification and the second assignment of error is not well-taken." See, also, *In re Shawn W.* (Sept. 30, 1996), Lucas App. No. L–95–267, 1996 WL 549223.

{¶ 85} Accordingly, the third assignment of error asserted by Natalie and her parents and Kevin's fourth assignment of error are found not well taken.

{¶ 86} This court will next address the second assignment of error asserted by Natalie and her parents with Kevin's first and second assignments of error. In these assignments of error, appellants argue that the trial court erred when it found clear and convincing evidence to support its decision to grant permanent custody of the baby to LCCS. This court finds no merit in these assignments of error.

{¶ 87} Natalie and her parents and Kevin raise several arguments in support of these assignments of error. They argue that the trial court erred in finding that there was clear and convincing evidence that they demonstrated a lack of commitment to the baby and that their planning for the adoption of the baby showed their commitment to her. In regard to Natalie and her parents, the trial court found that they never visited the baby and that from the beginning of the case, they believed that it was in the best interest of the baby to be adopted. In regard to Kevin, the trial court found that he visited the baby when his college was not in session until his commitment to the college swim team's training in Florida was more important than visiting with and caring for the baby. The trial court also found that Natalie and Kevin's joint motion asking the court to consent to the third-party, private adoption was further evidence of their desire not to obtain custody of the baby. The trial court found that pursuant to R.C. 2151.353(A)(4)[9] and R.C. 2151.414(E)(4), (15) and (16),[10] by clear and convincing

---

9.  {¶ a}  R.C. 2151.353(A)(4) provides:

    {¶ b}  "(A) If a child is adjudicated an abused, neglected, or dependent child, the court may make any of the following orders of disposition:

    {¶ c}  "* * *

    {¶ d}  "(4) Commit the child to the permanent custody of a public children services agency or private child placing agency, if the court determines in accordance with division (E) of section 2151.414 of the Revised Code that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of section 2151.414 of the Revised Code that the permanent commitment is in the best interest of the child. . * * *"

10.  {¶ a}  R.C. 2151.414(E)(4) provides:

    {¶ b}  "(E) In determining * * * whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

    {¶ c}  "* * *

    {¶ d}  "(4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child * * *.

    {¶ e}  "* * *

evidence that the baby cannot, and should not, be placed with either of the parents within a reasonable period of time, and pursuant to R.C. 2151.414(D),[11] an award of permanent custody to LCCS was in the best interest of the baby.

{¶ 88}  Generally, parents have a paramount right to custody of their minor children. *In re Murray* (1990), 52 Ohio St.3d 155, 157, 556 N.E.2d 1169. However, this right is not absolute. R.C. 2151.353 provides that if a child is adjudicated an abused child, the court may commit the child to the permanent custody of a public children's service agency if the court determines (1) in accordance with R.C. 2151.414(E), that the child cannot be placed with one of his parents within a reasonable time or should not be placed with either parent and determines (2) in accordance with R.C. 2151.414(D), that permanent commitment is in the best interest of the child.

{¶ 89}  The R.C. 2151.414 permanent custody determination must be supported by clear and convincing evidence. *In re Hiatt* (1993), 86 Ohio App.3d 716, 725, 621 N.E.2d 1222. On appeal from an order terminating parental rights, an appellate court will not reverse the trial court's judgment if, upon a review of the record, it determines that the trial court had sufficient evidence to satisfy the

---

{¶ f}  "(15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.

{¶ g}  "(16) Any other factor the court considers relevant."

11.  {¶ a}  R.C. 2151.414(D) provides:

{¶ b}  "(D) In determining the best interest of a child at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) or (5) of section 2151.353 or division (C) of section 2151.415 of the Revised Code, the court shall consider all relevant factors, including, but not limited to, the following:

{¶ c}  "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

{¶ d}  "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

{¶ e}  "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;

{¶ f}  "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

{¶ g}  "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ h}  "For the purposes of this division, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home."

clear-and-convincing standard. *In re Wise* (1994), 96 Ohio App.3d 619, 626, 645 N.E.2d 812. The "clear and convincing evidence" standard is a higher degree of proof than the "preponderance of the evidence" standard generally utilized in civil cases but is less stringent than the "beyond a reasonable doubt" standard used in criminal cases. *State v. Schiebel* (1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54. An appellate court will not substitute its own judgment for that of a trial court applying a "clear and convincing evidence" standard where some competent and credible evidence supports the trial court's factual findings. Id.; *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus.

{¶ 90} Our review of the record in this case reveals that the trial court properly considered the statutory factors in making its decision and cannot be said to have abused its discretion in this case. Natalie and her parents' failure ever to visit the baby or inquire about the baby and their request that the baby not be brought to a meeting speak volumes about the level of their commitment to the baby, as does Kevin's selection of an optional swim-team training over visiting and caring for the baby. Additionally, both Natalie and Kevin sought consent for a third-party adoption. Therefore, this court concludes that clear and convincing evidence was offered to demonstrate that Natalie and Kevin lacked commitment to the baby.

{¶ 91} Natalie and her parents next argue that the trial court erred in finding that there was likely to be a recurrence of the abuse of the baby. In regard to this argument, Natalie and her parents rely upon R.C. 2151.414(E)(15). However, R.C. 2151.414(E)(15) also provides that a finding that a child cannot or should not be reunified with the parents is to be made if the trial court determines that the seriousness or nature of the abuse or neglect makes placement with the parents a threat to the child's safety. In regard to Natalie, given where and in what condition the baby was found, this court cannot find that the trial court erred in its reliance upon R.C. 2151.414(E)(15). Natalie and her parents next argue that R.C. 2151.414(E)(16) is an arbitrary "catch-all provision." However, factor (E)(16) allows the consideration of any other factor the court considers relevant. See *In re Robert M.* (Sept. 13, 2001), Franklin App. No. 01AP–411, 2001 WL 1045556. The trial court's determination did not necessarily need to rest on any one of the other specifically enumerated factors. Having found that the trial court had sufficient evidence to support a finding pursuant to R.C. 2151.414(E)(4) and (15), this court need not address this argument further.

{¶ 92} The last argument advanced by Natalie and her parents is that reliance upon the Adoption and Safe Families Act of 1997, Section 671, Title 42, U.S.Code, by LCCS would be unwarranted. Having found that the trial court

had sufficient evidence to support a finding pursuant to the factors in R.C. 2151.414(E), we hold that this argument is without merit.

{¶ 93} Accordingly, the second assignment of error asserted by Natalie and her parents and Kevin's first and second assignments are found not well taken.

{¶ 94} This court will next address Kevin's fifth assignment of error. In this assignment of error, Kevin argues that movement of the baby from her foster home to his home was in the best interests of the baby. This court finds no merit in this assignment of error.

{¶ 95} In this assignment of error, Kevin places much emphasis upon the testimony of Burley. However, as discussed above, the weight to be given the evidence and the credibility of witnesses are primarily for the trier of fact to decide. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, paragraph one of the syllabus. This court cannot and will not substitute our judgment for that of the trier of fact. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 461 N.E.2d 1273.

{¶ 96} This court finds that the evidence supports the trial court's conclusion that the baby's best interest would be served by granting permanent custody to LCCS. Both the caseworker and the GAL testified that the baby is bonded with her foster family and that the foster family is a prospective adoptive family. R.C. 2151.414(D)(1). The GAL testified that the baby's best interest would be served by granting permanent custody to LCCS for purposes of adoption. R.C. 2151.414(D)(2).

{¶ 97} Accordingly, Kevin's fifth assignment of error is found not well taken.

{¶ 98} This court will next address the fifth assignment of error asserted by Natalie and her parents with Kevin's sixth assignment of error. In these assignments of error, appellants argue that they were each denied effective assistance of trial counsel. This court finds no merit in these assignments of error.

{¶ 99} The right to counsel, guaranteed in termination proceedings by R.C. 2151.352 and by Juv.R. 4 includes the right to the effective assistance of counsel. *In re Heston* (1998), 129 Ohio App.3d 825, 827, 719 N.E.2d 93. "Where the proceeding contemplates the loss of parents' 'essential' and 'basic' civil rights to raise their children (citations omitted), the test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking to force the permanent, involuntary termination of parental custody." Id.

{¶ 100} The two-part test for ineffective assistance of counsel outlined by the Ohio Supreme Court in *State v. Ballew* (1996), 76 Ohio St.3d 244, 255, 667 N.E.2d 369, requires a showing that (1) counsel's performance was defective, and (2) the

deficient performance prejudiced the result. To prevail, a litigant must show that counsel's representation fell below an objective standard of reasonableness. Id. at 256–257, 667 N.E.2d 369. A litigant must also prove that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Id. at 257, 667 N.E.2d 369.

{¶ 101} Furthermore, a court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" in reviewing a claim of ineffective assistance of counsel. *Strickland v. Washington* (1984), 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674. See, also, *State v. Carter* (1995), 72 Ohio St.3d 545, 558, 651 N.E.2d 965 ("To justify a finding of ineffective assistance of counsel, the appellant must overcome a strong presumption that, under the circumstances, the challenged action might be considered sound trial strategy."). A trial counsel's choice of tactics must be given deference. *State v. Nobles* (1995), 106 Ohio App.3d 246, 276, 665 N.E.2d 1137, discretionary appeal not allowed (1996), 74 Ohio St.3d 1510, 659 N.E.2d 1287. A litigant bears the burden of proving that his trial counsel was ineffective. *State v. Martens* (1993), 90 Ohio App.3d 338, 351, 629 N.E.2d 462. An appellate court need not address both components of the *Strickland* analysis if one component fails. *In re Hart* (Apr. 16, 1998), Cuyahoga App. No. 71783, 1998 WL 183863.

{¶ 102} Kevin argues that his trial counsel was ineffective because he failed to request discovery from LCCS. Kevin argues that this discovery would have shown the biased attitude of the GAL, caseworker, and LCCS attorney against Kevin and his family; the failure of the caseworker to implement a case plan for him; and the refusal of the LCCS attorney to allow his mother to visit with the baby. Further, Kevin argues that his trial counsel failed to cross-examine the GAL on her credentials and experience.

{¶ 103} In regard to Kevin's argument that his trial counsel was ineffective because he did not request certain discovery, there is no evidence presented in the record on appeal as to what pertinent facts might have been garnered by such action. *In re Wise* (1994), 96 Ohio App.3d 619, 628, 645 N.E.2d 812.

{¶ 104} In regard to Kevin's argument that his trial counsel was ineffective because he failed to cross-examine the GAL, a properly licensed attorney enjoys a presumption of competence. Generally, a trial counsel's decision to engage in a particular line of questioning will not be second-guessed on appeal. *State v. Clayton* (1980), 62 Ohio St.2d 45, 48–49, 16 O.O.3d 35, 402 N.E.2d 1189. Rather, the appellate court will consider trial counsel's decision to be the product of sound trial strategy. Id.

**{¶ 105}** Natalie and her parents argue that she received ineffective assistance of trial counsel because her trial counsel's errors were so serious that she did not receive the guarantee of the Sixth Amendment. Although Natalie and her parents list specific instances in which they argue that trial counsel was ineffective, they do not properly provide argument to support this aspect of this assignment of error. This court may disregard it. App.R. 16(A)(7) and 12(A)(2).

**{¶ 106}** However, even if this court were to address these assertions, we would find them to be without merit. As with Kevin's assertions of ineffective assistance, some of the asserted instances are outside the record on appeal[12] or there is no evidence in the record[13]; in other instances, there are no citations to the record.[14] The majority of the argument in their brief is devoted to the alleged failure in regard to affectional neonaticide, an argument stricken from the record.[15]

**{¶ 107}** In regard to their argument that trial counsel was ineffective because she did not appear at a pretrial hearing, trial counsel requested a continuance that was denied. All information exchanged at the hearing was to be shared with appellants' trial counsel; appellants have not shown how they were prejudiced by trial counsel's absence from this hearing.

**{¶ 108}** After reviewing all of the proceedings in the trial court, including the cross-examination of the caseworker and the GAL by trial counsel for Natalie and trial counsel for Kevin and the calling of four defense witnesses for Natalie and two defense witnesses for Kevin, we hold that the record does not demonstrate any deprivation of a substantial or procedural right which rendered the trial fundamentally unfair. The record shows that trial counsel for Natalie and trial counsel for Kevin vigorously and competently represented them.

**{¶ 109}** Accordingly, the fifth assignment of error asserted by Natalie and her parents and Kevin's sixth assignment of error are found not well taken.

---

12. For example, Natalie and her parents allege that their trial counsel failed to meet with them to explain the consequences of permanent termination of parental rights and failed to explain to Natalie the consequences of her failure to appear at the adjudication hearing.

13. Appellants allege that their trial counsel did not obtain a written confirmation of LCCS's intent to agree to an open adoption and failed to protect Natalie's parental rights when LCCS withdrew its consent to an open adoption.

14. For example, appellants allege that their trial counsel failed to ensure that appellant's rights were fully explained and that she had an opportunity to knowingly and intelligently waive those rights but fail to cite to any portion of the record in support of this argument.

15. Prior to oral argument, LCCS moved to strike from the brief filed by Natalie and her parents two law review articles in Appendix K and any reference to these articles. The motion to strike was granted. The two law review articles in Appendix K and any reference to these articles were stricken from the brief. Thus, this court need not address this argument.

{¶ 110}  On consideration whereof, the court finds that substantial justice has been done the parties complaining, and the judgment of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed.  Appellants are ordered to pay the court costs of this appeal equally.

Judgment affirmed.

MARK L. PIETRYKOWSKI, P.J., and RICHARD W. KNEPPER, J., concur.