DECISION AND JUDGMENT ENTRY
{¶ 1} This case is before the court on appeal from the Lucas County Court of Common Pleas, Juvenile Division, which entered a judgment granting permanent custody of appellant's three children to Lucas County Children's Services. For the following reasons we affirm the trial court's decision.
 {¶ 2} On February 4, 2004, Lucas County Children's Services ("LCCS") filed an original complaint for permanent custody of appellant, Tammy F.'s[1] three minor children. In its complaint, LCCS alleged that in 2001, the children were found to be dependent and neglected and temporary custody was awarded to LCCS. The parents, Tammy F. and Robert W. were given case plans. In April 2003, LCCS filed a motion for permanent custody alleging that neither parent had satisfactorily complied with their case plan.
 {¶ 3} At the time of the hearing, appellant had participated in the services and the parties concluded that it would be in the children's best interests that legal custody be restored to appellant with protective supervision to LCCS. Robert W.'s parental rights were terminated. The October 21, 2003 judgment entry also contained the provisions that neither appellant nor her children have contact with Robert W., Curtis B. or Jerald C.
 {¶ 4} According to LCCS, appellant violated the above provisions by allowing Robert W. to speak with the children on the telephone and she had arranged a time and date for Robert to visit them. Appellant visited Jerald C., an uncle, in the hospital. Jerald C. is a "substantiated sexual abuser" of Raven. Appellant allegedly had contact with Curtis B., a former boyfriend. Appellant also permitted a man, convicted in 1998 of domestic violence, to move in with her and the children.
 {¶ 5} On April 20, 2004, a hearing was held on the permanent custody complaint and the following testimony was presented. LCCS caseworker, Michelle Hoffman, testified that she became involved with the family in 2001. Hoffman testified that appellant's children had been in the custody of LCCS from December 2001 through October 2003. In October 2003, appellant was granted legal custody of the children and LCCS was awarded protective supervision. Hoffman stated that parent educators were visiting the family two to three times per week to work on the children's behavior issues. At this time, appellant was living in an apartment in Findlay, Ohio; around Christmas 2003, appellant moved into a trailer home in Findlay.
 {¶ 6} Regarding the children's father, Hoffman testified that he has antisocial personality disorder, has continuous domestic violence incidents involving appellant and others, has substance abuse problems, and has physically abused the children.
 {¶ 7} On January 5, 2004, Hoffman received a telephone call regarding concerns that appellant had a man living with her and that he was sleeping in a bedroom with appellant and two of the children. The individual also stated that appellant was having telephone contact with Robert W., that he was talking with the children, and that a visitation had been arranged. According to the individual, appellant had asked her sister-in-law to give Robert W. her telephone number because she did not have long-distance service.
 {¶ 8} The next day, Hoffman went to the children's school and they admitted that they had spoken with their father over ten times. They also stated that their mother told them that they would visit their father that Wednesday. The children stated that they had traveled to Chillicothe, Ohio, to visit their uncle, Jerald C., who was in the hospital. The children indicated that they did not actually see Jerald; they stayed in the waiting room. The children told Hoffman that appellant was driving Curtis B.'s car and went out with him on one occasion.
 {¶ 9} Hoffman testified that Jerald C., appellant's uncle, is a substantiated sexual abuser of Raven. Curtis B. lived with appellant while the children were in foster case. Curtis allegedly sexually abused a six-year old girl. The allegations were never substantiated, but the girl's story was found to be consistent. The October 2003 judgment prohibited appellant and her children from having contact with these men.
 {¶ 10} According to Hoffman, appellant's new boyfriend, Gerald L.,[2]
began living in the trailer in January. Hoffman stated that Gerald had past domestic violence issues and, in 2001, was an alleged sexual perpetrator in Wood County.
 {¶ 11} On January 7, 2004, a staffing, or meeting to discuss custody concerns, was held. Appellant along with LCCS staff discussed her contact with Robert W. Appellant stated that she allowed Robert to speak with the children and that she arranged the visitation so he would stop calling. Appellant signed a safety plan agreeing to go to Open Arms, a battered women's shelter in Findlay, Ohio, for 30 days.
 {¶ 12} Hoffman recounted that on February 2, 2004, a LCCS parent educator went to Open Arms and appellant was not there. The staff indicated that appellant had been gone.
 {¶ 13} for the weekend and that they did not know where she was. They did state that Raven and Robin were in respite care at their prior foster mother's home.
 {¶ 14} Shortly after leaving Open Arms, the parent educator was called on his cell phone and informed that appellant had returned and was packing to move to Chillicothe with her children and Gerald L. The parent educator informed appellant that she had to go to the agency to discuss the issues because she could not go to Chillicothe with the children. Appellant agreed.
 {¶ 15} On the way to Toledo, they picked up Aaron who rode with the parent educator. At the agency, appellant indicated that she would not return to the shelter and refused to go to a hotel with Aaron. According to Hoffman, appellant stated that she could not protect her children and she left the agency with Gerald L. Aaron was placed in foster care with his sisters.
 {¶ 16} Hoffman testified that a staffing was held the next morning and that appellant was absent. The outcome of the meeting was that LCCS decided to file for permanent custody.
 {¶ 17} During cross — examination, Hoffman testified that following the October 2003 judgment, appellant's services included parent educators visiting the home at least twice per week, appellant attending the Open Arms domestic violence group, Aaron was being monitored on his ADHD medication, and the girls had the parent educator working with them.
 {¶ 18} Hoffman testified that she is uncertain exactly how Robert W. obtained appellant's telephone number and that several of appellant's family members, especially her brother, had regular contact with Robert W.
 {¶ 19} During the period that the children were in foster care, Hoffman testified that appellant was always consistent with visitation and that the children looked forward to seeing her. Hoffman testified that the children are bonded with appellant and that they would like to remain with her. Hoffman also stated that appellant substantially complied with her case plan.
 {¶ 20} Jason Wegman, a LCCS parent educator, testified next. Wegman stated that he first became involved with Tammy and her children in October 2003. Wegman stated that he made weekly visits to appellant's home and stayed approximately one to one and one-half hours. Wegman testified that appellant allowed the children to watch a Jerry Springer episode in which she appears with their father and another woman. The purpose of the show was for Robert W. and the other woman to reveal to appellant that they were having an affair. Wegman discussed with appellant why he felt that this was inappropriate and she ultimately agreed.
 {¶ 21} Wegman testified that appellant had difficulty disciplining the children and appeared overwhelmed. Appellant was unable to set and enforce limits. Wegman stated that the children's behavior got worse once they moved from the apartment into the trailer.
 {¶ 22} Wegman stated that appellant had difficulties adapting to the Open Arms environment. He explained that appellant was overwhelmed with the children and did not really understand what was expected of her there.
 {¶ 23} On February 2, 2004, Wegman arrived at the shelter at around 4:30 p.m. and neither appellant nor her children were there. Wegman left. Shortly thereafter, he received a call on his cell phone informing him that appellant had returned to the shelter. Wegman returned to the shelter to find appellant packing all of her belongings. Appellant stated that she could not live this way anymore and it was not the life she wanted for her children. Appellant stated that she wished to move "down south."
 {¶ 24} Wegman discussed how he drove Aaron up to LCCS, in Toledo, with appellant following behind. Appellant was given the option of going back to the shelter or going to a hotel overnight so she could attend a LCCS staffing in the morning. Appellant refused. Wegman testified that at the time the complaint was filed, appellant was unable to provide adequate parental care for her children.
 {¶ 25} During cross-examination, Wegman acknowledged that appellant was bonded with her children and had tried very hard to do a good job for them. Wegman stated that appellant and her children had a very loving relationship.
 {¶ 26} At the conclusion of the above testimony, the trial court adjudicated the children to be dependent and neglected. The hearing then proceeded to the disposition phase.
 {¶ 27} LCCS caseworker, Michelle Hoffman, again testified. Hoffman stated that LCCS is seeking permanent custody because, even though appellant and the children clearly love and desire to be with each other, appellant is unable to protect the children. Hoffman explained that appellant has gone back with Robert W. three or four times during her involvement with LCCS, and that Robert has physically abused the children, appellant, and other people's children. Hoffman testified that all the men appellant has been with since the case's inception have had issues of sexual abuse and domestic violence. Hoffman felt that appellant's situation was not likely to change with any further services.
 {¶ 28} On cross-examination, Hoffman stated that she believed that it would be in the best interests of the children to have all contact with their mother severed. Hoffman admitted that the children were not in counseling and, thus, there was no professional opinion as to what would be best for them.
 {¶ 29} Next, Michelle Gregory, the children's guardian ad litem testified. Gregory testified that she had been involved in the case since 2001. Gregory testified that appellant and the children are very bonded. Gregory was asked whether her recommendation of permanent custody to LCCS would change knowing that Robert W. was jailed for a period of time, potentially allowing appellant to gain safety for herself. Gregory responded negatively based on appellant's history.
 {¶ 30} During cross-examination Gregory testified that appellant had been pretty consistent about getting employment. Gregory also stated that appellant was a cocaine or crack-cocaine user but had been clean for the past three years.
 {¶ 31} Gregory stated that her main concern in this case is the safety of the children. Gregory explained that once he was released from jail, Robert W. would most definitely make every effort to contact appellant. Gregory was also very concerned that appellant had contacted all three men on the no contact list.
 {¶ 32} Appellant was the last witness to testify. Appellant stated that Robert W. began contacting her after she moved into the trailer. Appellant stated that she did not contact the police because Robert had blocked the caller identification feature; the police indicated to her on a prior occasion that if they did not know where he was they could not do anything about it.
 {¶ 33} Appellant stated that Robert was currently in jail because of an incident, just over a week prior to the hearing, where he came to her home. Appellant called the police and then called Open Arms. Appellant stated that she planned to follow through with the prosecution of Robert, and that she is presently working with Open Arms.
 {¶ 34} Appellant testified that if she were to get her children back, her plan to keep them safe would be to move. She stated that she already has a new car and that she has changed her telephone number.
 {¶ 35} Regarding the visitation between the children and Robert W., appellant stated that she never intended to follow through with the visitation; she set it up so Robert would stop calling and harassing her.
 {¶ 36} Appellant testified that when she visited Jerald C., her uncle, she thought he had leukemia. She stated that when she saw him he was on oxygen and weighed about 80 pounds. Appellant testified that Jerald could not get out of his hospital bed.
 {¶ 37} Appellant stated that she wants what is best for her children, that she loves them, and that she is bonded with them. She wants them to be safe whether they are with her or with someone else.
 {¶ 38} During cross-examination, appellant testified that she felt that the counseling services were beneficial to her. Appellant also stated that if she regained custody of the children, counseling services would be beneficial. Appellant stated that the children need counseling to help to understand all the chaos in their lives.
 {¶ 39} Appellant testified that she has been drug free since 2001. She stated that she quit because "it wasn't me" and that her children deserved better.
 {¶ 40} When appellant was asked how she planned to keep her children safe, she stated: "Other than calling the cops on him again and me moving and not telling anybody, not even my own mom, there isn't much more I can say other than going into a shelter. * * *. I have done everything else."
 {¶ 41} Appellant did not know why she did not change her telephone number after she received her first telephone call from Robert W. Appellant testified that though she was instructed not to give her telephone number to anyone, she gave it to her mother and brother. Appellant stated that her brother did have contact with Robert W., and that, due to this fact, she had not spoken with her brother for the past four months. Appellant stated that when she moves again, not even her mother would know where she is.
 {¶ 42} Following the hearing, on May 18, 2004, the trial court entered its judgment entry in which it found by clear and convincing evidence that termination of appellant's parental rights was in the children's best interests and that the children cannot or should not be placed with appellant. The court found that appellant is unwilling to provide food, clothing, shelter and other necessities for the children or to prevent the children from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect. The court further found that "LCCS made reasonable efforts to prevent removal of the children by providing substance abuse treatment, counseling, including domestic violence counseling, a safety plan which included housing in a confidential shelter and case management but they were not successful because the mother did not cooperate." This appeal followed.
 {¶ 43} Appellant raises the following two assignments of error:
 {¶ 44} "I. The trial court erred in finding that the Lucas County Children Services Board had made a reasonable effort to reunify the minor children with appellant.
 {¶ 45} "II. The trial court erred in granting state's motion for permanent custody as it was against the manifest weight of the evidence to grant it."
 {¶ 46} Appellant's first assignment of error argues that the trial court erroneously found that LCCS made reasonable efforts to reunite appellant and her children during their involvement in this case. Appellee counters that because LCCS filed an original complaint for permanent custody, LCCS was not required to formulate a reunification plan.
 {¶ 47} Prior to granting an agency permanent custody, R.C.2151.414(B)(1)(a) requires the court to make two findings: (1) that a grant of permanent custody to the agency is in the child's best interest, and (2) that the child cannot or should not be placed with either parent within a reasonable period of time. In order to find that a child cannot or should not be placed with either parent within a reasonable period of time, a court must make a finding under R.C.2151.414(E).
 {¶ 48} Regarding reunification, this court, in In re Baby Girl Doe,149 Ohio App.3d 717, 2002-Ohio-4470, ¶¶ 83-84 addressed the issue as follows:
 {¶ 49} "In the case sub judice, LCCS filed an original custody complaint pursuant to R.C. 2151.353(A)(4). In In re Baby Girl Baxter
(1985), 17 Ohio St.3d 229, 17 Ohio B. 469, 479 N.E.2d 257, paragraph two of the syllabus, the Ohio Supreme Court held: `R.C. 2151.412 does not require a juvenile court to order a reunification plan when it makes a disposition order pursuant to R.C. 2151.353(A)(4).' In In the Matter of:Demetrius H. (Mar. 9, 2001), Lucas App. No. L-00-1300, 2001 Ohio App. LEXIS 1012, this court stated:
 {¶ 50} `While the trial court did make this finding, it is well-established that where a children services agency seeks original permanent custody of a child pursuant to R.C. 2151.353(A)(4), the agency is not required to establish a case plan. See In the Matter of: Misty B.
(Sept. 17, 1999), Lucas App. No. L-98-1431, 1999 Ohio App. LEXIS 4314, unreported; In the Matter of: Stephanie H. (Sept. 17, 1999), Huron App. No. H-99-009, 1999 Ohio App. LEXIS 4306, unreported. Accordingly, LCCS was not required to attempt reunification and the second assignment of error is not well-taken.' See, also In the Matter of: Shawn W. (Sept. 30, 1996), Lucas App. No. L-95-267, 1996 Ohio App. LEXIS 4226."
 {¶ 51} In this case, as in Baby Girl Doe, LCCS filed an original complaint for permanent custody pursuant to R.C. 2151.353(A)(4). Thus, LCCS was not required to formulate a reunification plan and the court's finding under R.C. 2151.414(E)(1) was in error. The trial court did, however, make a finding, under R.C. 2151.414(E)(14), that appellant was unable to provide food, clothing, shelter, or other basic necessities for the children or prevent them from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect. Accordingly, though the court erroneously made a finding as to LCCS' reunification efforts, the error was harmless because the court found 1 of the 16 enumerated conditions under R.C. 2151.414(E). See In the Matter of:Alexis W. (Sept. 30, 1999), 6th Dist. No. L-99-1022. Appellant's first assignment of error is not well-taken.
 {¶ 52} In her second assignment of error, appellant argues that the trial court's judgment awarding LCCS permanent custody was not supported by the manifest weight of the evidence. Appellant asserts that she substantially complied with the case plan in the prior case, has maintained contact with LCCS, has engaged in the services provided to her, has obtained employment and stable housing, and has a strong and loving bond with her children. Appellant states that there was evidence presented that she has the ability to protect her children.
 {¶ 53} Upon careful review of the evidence, we find clear and convincing evidence supporting the trial court's findings that the children cannot or should not be placed with appellant. Appellant has made choices which demonstrate that she is unable or unwilling to protect her children. On numerous occasions, appellant permitted the children to speak with Robert W. on the telephone; she arranged a meeting between the children and Robert W., which, fortunately, never took place.
 {¶ 54} Appellant, also in violation of the no contact order, took her children to Chillicothe, Ohio, to visit her uncle. The fact that the children did not see the uncle or that he was bedridden does not diminish the fact that appellant visited a man who was a substantiated sexual abuser of her daughter. Further, there was evidence that appellant, again in violation of the no contact order, had contact with Curtis B.
 {¶ 55} Finally, appellant made the choice to have her new boyfriend move into her two-bedroom trailer. LCCS advised appellant that Gerald L. had a prior conviction for domestic violence and that he was the subject of a sexual abuse investigation in Wood County; LCCS also suggested that appellant not have any further involvement with him. Despite this, appellant left Aaron at LCCS and left town with Gerald L.
 {¶ 56} Regarding the best interests of the children, it is apparent that the children love their mother and desire to remain with her. The guardian ad litem, however, recommended that LCCS be awarded permanent custody. The guardian based her recommendation on the fact that appellant violated the no contact order, moved a boyfriend into her trailer that had past domestic violence issues and a sexual abuse allegation, and appellant violated her safety plan by planning to move to Chillicothe, Ohio.
 {¶ 57} Based on the foregoing, we find that the evidence clearly and convincingly supports the trial court's findings that the children cannot or should not be placed with appellant and that permanent custody to LCCS is in their best interests. Appellant's second assignment of error is not well-taken.
 {¶ 58} On consideration whereof, we find that substantial justice was done the party complaining, and the decision of the Lucas County Court of Common Pleas, Juvenile Division, is affirmed. Pursuant to App.R. 24, appellant is ordered to pay the court costs of this appeal.
Judgment Affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, P.J., Pietrykowski, J., Singer, J.
[1] Following her divorce, Tammy legally changed her name from Tammy W. to Tammy F., her maiden name.
[2] During Hoffman's testimony, she incorrectly referred to Gerald L. as Gerald H.