898 A.2d 980

**In re BLESSEN H.**

**No. 71, Sept. Term, 2005.**

Court of Appeals of Maryland.

May 11, 2006.

Nenutzka C. Villamar, Asst. Public Defender (Nancy S. Forster, Public Defender, Baltimore), on brief, for petitioner.

Nancy Cowgill Hopkins, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen. of Maryland, Baltimore), on brief, for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BATTAGLIA, J.

This case arises out of an adjudicatory[1] and disposition hearing[2] held in the Circuit Court for Montgomery County, sitting as a juvenile court, during which Blessen H. was declared a child in need of assistance ("CINA")[3] pursuant to a

---

1. An adjudicatory hearing is a hearing under the Juvenile Causes subtitle of the Courts and Judicial Proceedings Article of the Maryland Code to determine whether the allegations in a petition for court intervention filed by the county department of social services on behalf of a child, other than the allegation that the child requires the court's intervention, are true. Md.Code (1973, 2002 Repl.Vol.), § 3–801(c) of the Courts and Judicial Proceedings Article.

2. Disposition hearing "means a hearing ... to determine: (1) Whether a child is in need of assistance; and (2) If so, the nature of the court's intervention to protect the child's health, safety, and well-being." Md. Code (1973, 2002 Repl.Vol.), § 3–801(m) of the Courts and Judicial Proceedings Article.

3. Maryland Code (1973, 2002 Repl.Vol.), Section 3–801(f) of the Courts and Judicial Proceedings Article defines a CINA as:

stipulated set of facts to which counsel for Blessen H.'s mother, Tynetta H. ("Ms. H."), had consented. Thereafter, Ms. H. filed a petition for writ of certiorari in this Court to consider the following question:

Whether in a CINA proceeding, the right to a contested adjudicatory hearing may be waived only by the parent's personal,[4] knowing, intelligent and voluntary waiver.

We granted the petition and issued the writ of certiorari, *In re Blessen H.*, 389 Md. 124, 883 A.2d 914 (2005). We shall hold that Ms. H.'s attorney's acceptance of the stipulated facts in the CINA petition constituted a sufficient waiver of Ms. H.'s right to a contested CINA adjudicatory hearing.

The relevant facts in this case are procedural. On July 29, 2003, the Montgomery County Department of Health and Human Services (the "Department") filed a petition alleging that Blessen H. was a Child In Need of Assistance. On September 2, 2003, pursuant to Maryland Code (1973, 2002 Repl. Vol.), Section 3–817 of the Courts and Judicial Proceedings Article,[5] an adjudicatory hearing was held in the Circuit

---

"Child in need of assistance" means a child who requires court intervention because:
(1) The child has been abused, has been neglected, has a developmental disability, or has a mental disorder; and
(2) The child's parents, guardian, or custodian are unable or unwilling to give proper care and attention to the child and the child's needs.

4. The word "personal" in the certiorari question appears to have been taken from the Court of Special Appeals's opinion. We understand by its use that Ms. H. is asking whether she is entitled, prior to acceptance of a waiver of a contested adjudicatory hearing, to a colloquy with the judge in which he or she explains the nature and consequences of such a hearing, and any rights that Ms. H. may have related to such a hearing, and inquires whether Ms. H. knowingly, intelligently and voluntarily is relinquishing her right to a contested proceeding.

5. Maryland Code (1973, 2002 Repl.Vol.), Section 3–817of the Courts and Judicial Proceedings Article, provides:
(a) *Required.*—After a CINA petition is filed under this subtitle, the court shall hold an adjudicatory hearing.
(b) *Applicability of Maryland Rules.*—The rules of evidence under Title 5 of the Maryland Rules shall apply at an adjudicatory hearing.

Court for Montgomery County, sitting as a juvenile court, to determine whether the allegations in the petition were true. The following colloquy ensued during the hearing at which Ms. H., her counsel, Sheldon A. (Blessen's father), and the Department were present:

THE COURT: Now, this is set for trial today. Tell me how we're proceeding.

THE DEPARTMENT: Well, Your Honor, we have had some discussions, I think as I indicated before we were on the record with this case, attempting to see if we could reach any type of agreement.

This case is a little different than our normal scheduled cases because there was a conflict with the pretrial date. Counsel for the mother attempted to reschedule and file a motion, I believe, in that attempt, and because of different people's calendars and court calendar conflicts, we were never able to have a pretrial scheduled in this case.

THE COURT: Right.

THE DEPARTMENT: I had discussions with [Ms. H.'s counsel] outside, and while she said her client was not of a mind, in the brief time that we were talking, to reach an agreement, she did talk to her about what her thoughts would be about discussion with a mediator. And I believe she had some comments on that point with regard to her client's willingness to have settlement discussions with us with the assistance of the mediator. If one were available.

\* \* \*

COUNSEL FOR MS. H.: Yes, I did discuss with my client, and she is in agreement. If we could try to mediate this, she is willing to do that.

The court then iterated that, should mediation not be successful, a trial would not be possible later that day, and asked the parties:

---

(c) *Standard of Proof.*—The allegations in a petition under this subtitle shall be proved by a preponderance of the evidence.

THE COURT: Tell me what you want to do? I'll start the trial right now. I will send you to mediation at 1:30. I will have this trial later this afternoon. We'll get the administrative judge to continue the trial if mediation is not fruitful, so we don't have to do it this afternoon.

You just tell me what you want me to do. If you all think that mediation will be fruitful, then it's probably a good use of time.

THE DEPARTMENT: I would like to at least attempt mediation.

COUNSEL FOR MS. H.: My client wants mediation. She wants to mediate.

Thereafter, the court adjourned, and the parties entered into mediation.

Later that afternoon, after mediation, the parties returned to the courtroom and the adjudicatory hearing continued:

THE DEPARTMENT: Your Honor, we did reach an agreement based on an amended petition.

\* \* \*

THE COURT: All right. You do have an amended petition? Go ahead.

THE DEPARTMENT: The amended petition is amended by handwriting and I placed at the top, "Factual Basis for CINA, September 2/03."

THE COURT: Does everybody have a copy of this, or do you want us to make copies? Did you make copies?

THE DEPARTMENT: We made copies.

\* \* \*

THE COURT: [I]s it everyone's position, then, that these facts should be sustained and form the basis for a finding of CINA?

COUNSEL FOR THE CHILDREN: Yes, Your Honor.

COUNSEL FOR MS. H.: Yes, Your Honor.

SHELDON A.: Yes, Your Honor.

THE COURT: All right. I will make such a finding, that based on the agreement of all counsel and parties, because Mr. A. is here without counsel, that the facts alleged are now facts sustained, and they form a basis for a finding of CINA, and I will so find, that the child Blessen H. is a child in need of assistance.

The parties' agreement was placed on the record by the Department; it called for Blessen H. to stay in foster care until successful completion of a home study of the paternal grandmother's home, after which Blessen H. would be placed with the paternal grandmother, with weekly supervised visitation with Sheldon A., monthly supervised visitation with Ms. H., and no visitation with her maternal grandmother, Ms. G.

At the conclusion of the proceedings, the court brought Ms. G. into the courtroom to inform her that she was to have no contact with Blessen until further notice. Ms. G. then asked the judge if she could have the opportunity to explain her involvement in a prior incident with Blessen and Ms. H. that was of concern to the court, whereupon Ms. G. began to place blame for the incident on Ms. H., to which Ms. H. responded:

MS. H.: I can't deal with this. It's so many lies on this place. It's just ridiculous.

COUNSEL FOR MS. H.: Shhhh.

MS. H.: It really is. You know. I'm trying to be the best parent I can be. I have already been slandered by DHS.

Sheldon don't like some of this. And I have swallowed my pride to try to get this court hearing done. Okay.

I don't deserve this. I've been the best mother I can be.

I have listened to you, Your Honor, have saying things to me, and you haven't even asked me about my own character. You haven't even asked me—

THE COURT: Asked you about your own what?

MS. H.: My own character. How did I end up in this situation. Why was I traveling? Why was my child not in a stable home? Some of these things are not—

THE COURT: Well, you have an attorney, ma'am, and I was listening to your attorney.

MS. H.: I can't speak no more, Your Honor. I really can't.

THE COURT: Well, then, don't.

MS. H.: I really can't.

THE COURT: Okay.

MS. H.: You can go ahead and do the trial. I need to sit outside.

THE COURT: Well, there isn't any trial. This is finished.

Ms. H. subsequently appealed to the Court of Special Appeals alleging that her attorney's stipulation to the facts in the CINA petition was not sufficient to waive her right to a contested CINA adjudicatory hearing because the waiver had to have been made voluntarily, knowingly and intelligently by Ms. H. In a reported opinion, the Court of Special Appeals affirmed the trial court's CINA determination and emphasized that the requirement of a personal, voluntary, knowing and intelligent waiver has only been applied in punitive proceedings that carry the risk of incarceration. The intermediate appellate court noted that, although CINA proceedings implicate the fundamental right of a parent to raise his or her children, thereby demanding a certain level of due process, it is less than that owed an individual who faces the loss of personal liberty, and therefore, a personal waiver under the *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), standard was not required.

Ms. H. contends that CINA adjudicatory hearings represent the first step towards termination of a parent's right to raise his or her children, which, as a fundamental right, requires the highest level of due process protection. The significance of CINA adjudicatory hearings, she alleges, is reflected in the requirement contained in Section 3–817(b) of the Courts and Judicial Proceedings Article of the Maryland Code (1973, 2002 Repl. Vol.) of the strict application of the Maryland Rules of Evidence during the proceedings, as contrasted with the discretionary application of the Maryland Rules of Evidence in

CINA shelter care hearings,[6] disposition hearings, permanency planning hearings,[7] and subsequent review hearings.[8] Moreover, Ms. H. points out that parents have the right to representation by counsel during CINA adjudicatory hearings, and that indigent parents are provided counsel at the State's cost.[9] Ms. H., therefore, maintains that, as due process requires both the strict application of the Maryland Rules of Evidence and representation by counsel during CINA adjudicatory hearings, so must it require the most stringent form of waiver to forego those proceedings. Ms. H. also claims that the strictest form of waiver is required because CINA proceedings can give rise to separate criminal proceedings against

---

**6.** Shelter care hearing means a "hearing held before disposition to determine whether the temporary placement of the child outside the home is warranted." Md.Code (1973, 2002 Repl.Vol.), § 3–801(x) of the Court and Judicial Proceedings Article.

**7.** Permanency plan hearing means a hearing in which the court determines the child's permanency plan after the child is determined to be a CINA, the options being: reunification with the child's parents or guardian, placement with relatives for guardianship or adoption, adoption or guardianship by nonrelative, continuation in current placement due to the child's special needs, or, if sixteen years or older, preparation for independent living. Md.Code (1984, 1999 Repl.Vol.), § 5–525(e) of the Family Law Article.

**8.** Review hearing means hearing conducted by court six months after child is placed outside of the home to review the child's permanency plan, or every twelve months after child is placed with a caregiver who has agreed to care for the child on a permanent basis. Md.Code (1973, 2003 Repl.Vol.), § 3–823(h) of the Courts and Judicial Proceedings Article.

**9.** Maryland Code (1973, 2002 Repl.Vol.), Section 3–813 of the Courts and Judicial Proceedings Article provides in relevant part:

(a) *In general.*—Except as provided in subsection (b) and (c) of this section, a party is entitled to the assistance of counsel at every stage of any proceeding under this subtitle.

(b) *Eligible parties.*—Except for the local department and the child who is the subject of the petition, a party is not entitled to the assistance of counsel at State expense, unless the party is:

(1) Indigent; or

(2) Otherwise not represented and:

(i) Under the age of 18 years; or

(ii) Incompetency by reason of mental disability.

the parents. Accordingly, Ms. H. alleges that the right to a contested CINA adjudicatory hearing only can be waived where the record affirmatively discloses a personal, voluntary, knowing and intelligent relinquishment of the right by the parent herself, which requires a colloquy on the record in which the court would advise the parent of the right to have a contested CINA adjudicatory hearing, of the right to compel and present witnesses and to present evidence during the proceedings, that waiver of the hearing could lead to limitation of the parental rights, of the risk of making incriminating statements during the proceedings, and of the burden of proof assigned to the State, as well as would inquire into whether the parent is under the influence of alcohol or drugs, understands the English language, and is waiving the proceedings voluntarily, absent any duress or coercion.

Conversely, the State argues that the juvenile court was not required to make a personal inquiry of Ms. H. to confirm that her waiver of the contested adjudicatory hearing was voluntary, knowing and intelligent because, based upon the totality of the circumstances, it was clear to the court that Ms. H.'s waiver was voluntary, knowing and intelligent. Moreover, the State argues that the stricter standard of waiver is not required for all proceedings that implicate fundamental rights, only those that are punitive in nature and present the possibility of incarceration, unlike CINA proceedings, which are remedial in nature and cannot result in confinement. Furthermore, the State asserts that the application of the personal, voluntary, knowing and intelligent standard of waiver to these proceedings would be inconsistent with other procedural aspects of CINA adjudicatory actions, such as the low burden of proof, a preponderance of the evidence, assigned to the State. The State also contends that the application of this heightened standard of waiver also would be inconsistent with *In re Adoption/Guardianship No. 93321055,* 344 Md. 458, 687 A.2d 681 (1997), where this Court held that Maryland's statutory scheme, which permits parents to waive their right to contest termination of their parental rights through inaction, does not violate due process.

## A. Fundamental Right of Parenting and CINA Proceedings

Maryland has long recognized the right of parents to raise their children "with minimal state interference" as a constitutionally protected fundamental right. *See In re Billy W., Jessica W., Mary S. & George B.*, 386 Md. 675, 683, 874 A.2d 423, 428 (2005); *In re Samone H. and Marchay E.*, 385 Md. 282, 299, 869 A.2d 370, 380 (2005); *In re Mark M.*, 365 Md. 687, 705, 782 A.2d 332, 342–43 (2001); *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 112, 642 A.2d 201, 208 (1994) (quoting *Lassiter v. Department of Social Services*, 452 U.S. 18, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). Indeed, we have iterated that:

A parent's interest in raising a child is, no doubt, a fundamental right, recognized by the United States Supreme Court and this Court. The United States Supreme Court has long avowed the basic civil right encompassed by child rearing and family life. *See Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 2060, 147 L.Ed.2d 49, 57 (2000) (stating that 'the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children'); *See also Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 1394–95, 71 L.Ed.2d 599, 606 (1982) (discussing 'the fundamental liberty interest of natural parents in the care, custody, and management of their child'); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551, 558–59 (1972)(stating that '[t]he rights to conceive and to raise one's children have been deemed 'essential,' and that '[t]he integrity of the family unit has found protection in the Due Process Clause of the Fourteenth Amendment ... the Equal Protection Clause of the Fourteenth Amendment ... and the Ninth Amendment ....') (internal citations omitted). Maryland, too, has declared a parent's interest in raising a child to be so fundamental that it 'cannot be taken away unless clearly justified.' *Boswell v. Boswell*, 352 Md. 204, 218, 721 A.2d 662, 669 (1998) (citing *In re Adoption No. 10941*, 335 Md. 99, 112, 642 A.2d 201 (1994)).

*In re Samone H.,* 385 Md. at 300, 869 A.2d at 380 (quoting *In re Mark M.,* 365 Md. at 705, 782 A.2d at 342–43). This right, however, is not absolute:

> Pursuant to the doctrine of *parens patriae,* the State of Maryland has an interest in caring for those, such as minors, who cannot care for themselves. *See Boswell,* 352 Md. at 218–19, 721 A.2d at 669. We have held that 'the best interests of the child may take precedence over the parent's liberty interest in the course of a custody, visitation, or adoption dispute.' *Boswell,* 352 Md. at 219, 721 A.2d at 669; *see also In re Adoption No. 10941,* 335 Md. at 113, 642 A.2d at 208 (stating that "the controlling factor ... is ... what best serves the interest of the child"). That which will best promote the child's welfare becomes particularly consequential where the interests of a child are in jeopardy, as is often the case in situations involving sexual, physical, or emotional abuse by a parent. As we stated in *In re Adoption/Guardianship No. A91–71A,* 334 Md. 538, 640 A.2d 1085 (1994), the child's welfare is 'a consideration that is of transcendent importance' when the child might otherwise be in jeopardy. *Id.* at 561, 640 A.2d at 1096 (citation omitted).

\* \* \*

> We have recognized that in cases where abuse or neglect is evidenced, particularly in a CINA case, the court's role is necessarily more pro-active. *See In re Justin D.,* [357 Md. 431, 448, 745 A.2d 408, 417 (2000) ].

*In re Mark M.,* 365 Md. at 705–07, 782 A.2d at 343.

The federal and state roles in the child welfare system were explored in *In re Yve S.,* 373 Md. 551, 819 A.2d 1030 (2003) (quoting from Judge Karwacki in *In re Adoption/Guardianship No. 10941,* 335 Md. 99, 103–06, 642 A.2d 201, 203–05 (1994));

> The Maryland General Assembly has enacted a comprehensive statutory scheme to address those situations where a child is at risk because of his or her parents' inability or unwillingness to care for him or her. Title 5 of the Family

Law Article of the Maryland Code (1984, 1991 Repl.Vol.) (Hereinafter "F.L.") governs the custody, guardianship, adoption and general protection of children who because of abuse or neglect come within the purview of the Department of Human Resources . . .

\* \* \*

During the 1970's, nationwide concern grew regarding the large number of children who remained out of the homes of their biological parents throughout their childhood, frequently moved from one foster care situation to another, thereby reaching majority without belonging to a permanent family. This phenomenon became known as 'foster care drift' and resulted in the enactment by Congress of Public Law 96–272, the 'Adoption Assistance and Child Welfare Act of 1980,' codified at 42 U.S.C. §§ 610–679 (1988). One of the important purposes of this law was to eliminate foster care drift by requiring states to adopt statutes to facilitate permanent placement for children as a condition to receiving federal funding for their foster care and adoption assistance programs.

Under the federal act, a state is required, among other things, to provide a written case plan for each child for whom the state claims federal foster care maintenance payments. 42 U.S.C. § 671(a)(16). The case plan must include a description of the home or institution into which the child is placed, a discussion of the appropriateness of the placement, and a description of the services provided to the parents, child and foster parents to facilitate return of the child to his or her own home or to establish another permanent placement for the child. 42 U.S.C. § 675(1). The state must also implement a case review system that provides for administrative review of the case plan at least every six months and judicial review no later than eighteen months after placement and periodically thereafter. 42 U.S.C. § 675(5)(B) and (C). The purpose of the judicial review is to 'determine the future status of the child' including whether the child should be returned to its biologi-

cal parents, continued in foster care for a specified period, placed for adoption, or because of the child's special needs or circumstances, continued in foster case on a long term basis. 42 U.S.C. § 675(5)(C).

Maryland receives considerable federal funds pursuant to this Act. Accordingly, the Maryland General Assembly has enacted legislation to comply with the federal requirements. Under Maryland' statutory scheme, for those children committed to a local department of social services the department is required to develop and implement a permanency plan that is in the best interests of the child. F.L. § 5–525.

In developing the permanency plan, the department is required to consider a statutory hierarchy of placement options in descending order of priority. F.L. § 5–525(c). First and foremost, the department must consider returning the child to the child's natural parents or guardians. F.L. § 5–525(c)(1). If reunification with the biological parents is not possible, the department must consider placing the child with relatives to whom adoption, guardianship, or care and custody, in descending order of priority, are planned to be granted. F.L. § 5–525(c)(2). If placement with relatives is not possible, then the department must consider adoption by a current foster parent or other approved adoptive family. F.L. § 5–525(c)(3). *Only in exceptional situations as defined by rule or regulation is a child to be placed in long term foster care.* F.L. § 5–525(c)(5).

If it is determined that reunification is not possible and that adoption is in the child's best interests, the juvenile court lacks jurisdiction to finalize this plan. *In re Darius A.*, 47 Md.App. 232, 235, 422 A.2d 71, 72 (1980); *see also* F.L. § 1–201. Instead, unless the parents consent to the adoption of their child, the department is required to petition the circuit court for guardianship pursuant to F.L. § 5–313. If the circuit court finds by clear and convincing evidence, after considering the statutorily enumerated factors, that it is in the best interests of a child previously adjudicated a CINA for parental rights to be terminated, the circuit court has authority to grant the department's

petition for guardianship. Such award carries with it the right for the department to consent to the adoption of the child. F.L. §§ 5–311 and 5–317(f).

The overriding theme of both the federal and state legislation is that a child should have permanency in his or her life. The valid premise is that it is in a child's best interest to be placed in a permanent home and to spend as little time as possible in foster care. Thus, Title 5 of the Family Law Article seeks to prevent the need for removal of a child from its home, to return a child to its home when possible, and where returning home is not possible, to place the child in another permanent placement that has legal status.

*Id.* at 573–76, 819 A.2d at 1043–45 (emphasis added); *see also In re Adoption/Guardianship Nos. J9610436 and J9711031,* 368 Md. 666, 676–78, 796 A.2d 778, 783–85.

Under this statutory scheme, upon receipt of a complaint from a person or agency that a child is being abused or neglected, the county department of social services undertakes an investigation to determine whether the child is in need of assistance. *See* Md.Code (1973, 2002 Repl.Vol.), § 3–809(a) of the Courts and Judicial Proceedings Article. If the department concludes that the court has jurisdiction over the matter and determines that filing a petition would be in the best interest of the child, it will file a petition alleging that the child is in need of assistance. After the petition is filed, "the court shall hold an adjudicatory hearing," Md.Code (1973, 2002 Repl.Vol.), § 3–817 of the Courts and Judicial Proceedings Article,[10] the purpose of which is to determine whether the allegations in the petition for court intervention are true. Md.Code (1973, 2002 Repl.Vol.), § 3–801(c) of the Courts and Judicial Proceedings Article. At the adjudicatory hearing, the Maryland Rules of Evidence under Title 5 of the Maryland

---

**10.** See also Maryland Rule 11–114, which provides in pertinent part:
**Adjudicatory hearing.**
a. **Requirement.** After a juvenile petition has been filed, and unless jurisdiction has been waived, the court shall hold an adjudicatory hearing.

Rules apply, and the allegations in the petition must be proved by a preponderance of the evidence. Md.Code (1973, 2002 Repl.Vol.), § 3–817 of the Courts and Judicial Proceedings Article. It is within this statutory scheme that we must determine what level of due process protection must be afforded parents who are deemed to have waived a contested CINA adjudicatory hearing.

## B. Voluntary, Knowing and Intelligent Waiver

In the case *sub judice* we are faced with the question of whether Ms. H.'s attorney's agreement with the stipulated facts presented by the State constituted an effective waiver of Ms. H.'s right to a contested CINA adjudicatory hearing.

The term "waiver," as noted by Justice Black, speaking for the Supreme Court in *Green v. U.S.*, 355 U.S. 184, 191, 78 S.Ct. 221, 226, 2 L.Ed.2d 199, 206 (1957), "is a vague term used for a great variety of purposes, good and bad, in the law." Its ambiguity results from the infinite number of rights that can be waived and the various procedures available for waiver, as the Supreme Court illustrated in *U.S. v. Olano*, 507 U.S. 725, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993):

> [W]aiver is the 'intentional relinquishment or abandonment of a known right.' Whether a particular right is waivable; whether the defendant must participate personally in the waiver; whether certain procedures are required for waiver; and whether the defendant's choice must be particularly informed or voluntary, all depend on the right at stake.

*Id.* at 733, 113 S.Ct. at 1777, 123 L.Ed.2d at 519 (citations omitted). Judge John C. Eldridge, writing for this Court, also has reflected upon the ambiguity inherent in the term "waiver" in *Curtis v. State*, 284 Md. 132, 395 A.2d 464 (1978):

> In the broadest sense of the word, any tactical decision by counsel, inaction by counsel, or procedural default, could be described as a "waiver." For example, an attorney must make numerous decisions in the course of a trial. Whenever he makes one, choosing to take or forego a particular action, the alternate choice could be said to have been

waived. However, with regard to constitutional rights in a criminal proceeding, in a much narrower sense the term waiver could be said to connote the intelligent and knowing relinquishment of certain basic constitutional rights under circumstances where the courts have held that only such intelligent and knowing action will bind the defendant.

*Id.* at 147, 395 A.2d at 473.

Because of the plethora of opportunities to waive substantive rights, as well as procedural safeguards, the Supreme Court, as well as this Court, have required judges to personally address a party on the record only in limited circumstances, to ensure that the waiver is being made voluntarily, knowingly and intelligently. These circumstances have included only those proceedings in which the right sought to be waived was "fundamental" and from which confinement could result.

The seminal case addressing voluntary, knowing and intelligent waivers and the limited circumstances in which "personal" waivers are required is *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938), a habeas corpus case in which the defendant complained he had been convicted of uttering and possession of counterfeit money without the benefit of counsel. Exploring the level of scrutiny that should be afforded a waiver of the Sixth Amendment right to counsel, the Supreme Court emphasized that " 'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights," and determined that:

> [i]f the accused . . . is not represented by counsel and has not competently and intelligently waived his constitutional right, the Sixth Amendment stands as a jurisdictional bar to a valid conviction and sentence depriving him of his life or his liberty.

*Id.* at 464, 468, 58 S.Ct. at 1023, 1024, 82 L.Ed. at 1466, 1468. To ensure that "there is an intelligent and competent waiver by the accused," *id.* at 465, 58 S.Ct. at 1023, 82 L.Ed. at 1467, the Supreme Court determined that trial courts should inquire into "the background, experience, and conduct of the accused," *id.* at 464, 58 S.Ct. at 1023, 82 L.Ed. at 1466, and suggested

that such inquiry "appear upon the record." *Id.* at 465, 58 S.Ct. at 1023, 82 L.Ed. at 1467. Therefore, the stricter standard of waiver requiring a colloquy arose with respect to the relinquishment of a fundamental right in a proceeding that could result in confinement.

The Supreme Court further explored the heightened standard of waiver in *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), in which the Court held that a knowing and intelligent waiver was not required for the defendant to consent to a search of his vehicle because:

> It would be unrealistic to expect that in the informal, unstructured context of a consent search, a policeman, upon pain of tainting the evidence obtained, could make the detailed type of examination demanded by *Johnson*. And, if for this reason a diluted form of 'waiver' were found acceptable, that would itself be ample recognition of the fact that there is no universal standard that must be applied in every situation where a person foregoes a constitutional right.

*Id.* at 245, 93 S.Ct. at 2057, 36 L.Ed.2d at 873. Highlighting the distinctions between the protection against unreasonable searches contained in the Fourth Amendment and the promotion of a fair criminal trial in the Sixth Amendment, the Supreme Court acknowledged that the "cases do not reflect an uncritical demand for a knowing and intelligent waiver in every situation where a person has failed to invoke a constitutional protection." *Id.* at 235, 93 S.Ct. at 2052, 36 L.Ed.2d at 867, but rather, a more personal or stricter standard of waiver is only required in proceedings in which fundamental rights are implicated and from which confinement could result:

> A prime example is the right to counsel. For without that right, a wholly innocent accused faces the real and substantial danger that simply because of his lack of legal expertise he may be convicted.

*Id.* at 241, 93 S.Ct. at 2055, 36 L.Ed.2d at 871.

In addition to the right to counsel, the application of the stricter standard of waiver has also been extended to other fundamental procedural rights in proceedings which could

result in confinement, such as waiver of the right to trial through entry of a guilty plea, *Boykin v. Alabama*, 395 U.S. 238, 243–44, 89 S.Ct. 1709, 1712, 23 L.Ed.2d 274, 280 (1969) ("What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence."); the waiver of the right to trial by jury, *Adams v. United States*, 317 U.S. 269, 63 S.Ct. 236, 87 L.Ed. 268 (1942) (concluding that defendant had personally, intelligently and competently waived his right to a jury trial where the record showed that the trial court had informed defendant of his constitutional rights, inquired into the defendant's legal experience, and had been repeatedly assured by the defendant that he knew what he was doing); and the waiver of the right to counsel in juvenile delinquency determinations, *Application of Gault*, 387 U.S. 1, 42, 87 S.Ct. 1428, 1451, 18 L.Ed.2d 527, 554 (1967) ("[The parties] had a right expressly to be advised that they might retain counsel and to be confronted with the need for specific consideration of whether they did or did not choose to waive the right.").

We also have required the heightened standard of personal waiver of specific fundamental rights in proceedings that could result in confinement. *See e.g., Curtis v. State*, 284 Md. at 143, 395 A.2d at 470 ("The determination of whether there has been an intelligent waiver of right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.") (quoting *Johnson v. Zerbst*, 304 U.S. at 464, 58 S.Ct. at 1023, 82 L.Ed. at 1466);[11] *State v. Priet*, 289 Md. 267, 290, 424 A.2d 349, 360–61 (1981) (holding guilty pleas knowingly and voluntarily entered when trial judge questioned each defendant at length as to voluntariness of

---

11. *See also* Maryland Rule 4–215(b) ("If a defendant who is not represented by counsel indicates a desire to waive counsel, the court may not accept the waiver until it determines, after an examination of the defendant on the record ... that the defendant is knowingly and voluntarily waiving the right.")

plea, and each defendant was informed of the penalty for the offense and of the constitutional and other rights waived by entry of the plea);[12] *Countess v. State,* 286 Md. 444, 454, 408 A.2d 1302, 1307 (1979) ("The inquiry upon which the court determines that the defendant has made his election for a court trial with full knowledge of his right to a jury trial and has knowingly and voluntarily waived the right, must be 'of the defendant on the record.' ").

Based upon this body of law, Ms. H. contends that, because CINA proceedings can be likened to criminal and quasi-criminal proceedings, as expressed by the Supreme Court in *M.L.B. v. S.L.J.,* 519 U.S. 102, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996), due process requires application of the more stringent standard of waiver in CINA adjudicatory proceedings. In *M.L.B. v. S.L.J.,* 519 U.S. 102, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996), a mother was denied her right to appeal the decision to terminate her parental rights because she could not afford to prepay the cost of the appellate proceedings as required by Mississippi law. Holding that the law denied the mother both equal protection and due process of law, the Supreme Court likened the termination proceedings to criminal and quasi-criminal proceedings for which a defendant's access to appeal could not be denied because of the inability to pay transcript fees. *Id.* at 123, 117 S.Ct. at 567, 136 L.Ed.2d at 492. The analogy, however, to criminal or quasi-criminal proceedings in access to appeal cases when the Court had theretofore mandated public assistance to indigents is inapposite to the case at bar because neither the Supreme Court nor this Court has ever required a personal waiver of fundamental rights in proceedings that could not result in confinement.

In *Hersch v. State,* 317 Md. 200, 562 A.2d 1254 (1989), for example, this Court explored whether an attorney could waive the defendant's right to a contested probation revocation

---

12. *See also* Maryland Rule 4–242(c) ("The court may accept a plea of guilty only after it determines, upon an examination of the defendant on the record in open court ... that ... the defendant is pleading voluntarily, with understanding of the nature of the charge and the consequences of the plea....)"

hearing or whether the waiver had to be elicited from the defendant himself. Noting that revocation of probation proceedings are civil proceedings, we explained that:

the fact that a probation violation proceedings is civil in nature is also not dispositive.... A probation revocation proceeding can, and often does, result in *immediate deprivation of liberty*. Because the Fourteenth Amendment guarantees that no person shall be deprived of liberty without due process of law, the Supreme Court has said that many, though not all, of the constitutional protections available to criminal defendants must be afforded to persons facing revocation of parole or probation.

*Id.* at 207, 562 A.2d at 1257 (emphasis added). Accordingly, we held that:

when the immediate consequences of a violation of probation may well be imprisonment, often for a significant period of time, we believe *Johnson v. Zerbst* standard must apply to the waiver of the important right that the probationer has to put the State to its proof.... [N]o particular litany is required to show a waiver of these rights by a probationer, but the record must show that 'the charge was explained to the probationer in understandable terms and that his response demonstrated that this actions were *knowing and voluntary.*' It takes but a few moments to ensure that the probationer *personally understands* the nature of the charges of alleged violations.

*Id.* at 208–209, 562 A.2d at 1258 (emphasis added). In so doing, we reviewed the Supreme Court cases requiring a colloquy with the defendant only where there was a possibility of confinement and fundamental rights were implicated.

In *Jones v. State*, 351 Md. 264, 718 A.2d 222 (1998), we addressed the question of whether a waiver of the defendant's right to a contested constructive civil contempt hearing under Maryland Rule 15–207(e) [13] may be effectuated through the

---

**13.** Maryland Rule 15–207(e) provides:

defendant's attorney, or whether the defendant himself personally had to waive the proceedings. Applying the reasoning in *Hersch,* we observed that:

> [w]e imposed th[e] higher standard of waiver in violation of probation proceedings because we concluded that on balance, this standard 'goes a long way toward ensuring essential fairness in an important proceeding while imposing only a small additional burden upon the trial judge and permitting the proceeding to remain essentially informal.'

Under Appellant's analysis, he is entitled to the procedural protections that defendants enjoy in violation of probation proceedings because, in his view, the court's finding of contempt exposes him to the 'threat of immediate incarceration.' He is incorrect.

---

(e) **Constructive Civil Contempt—Support Enforcement Action.** (1) Applicability. This section applies to proceedings for constructive civil contempt based on an alleged failure to pay spousal or child support, including an award of emergency family maintenance under Code, Family Law Article, Title 4, Subtitle 5.

(2) Petitioner's Burden of Proof. Subject to subsection (3) of this section, the court may make a finding of contempt if the petitioner proves by clear and convincing evidence that the alleged contemnor has not paid the amount owed, accounting from the effective date of the support order through the date of the contempt hearing.

(3)When a Finding of Contempt May Not Be Made. The court may not make a finding of contempt if the alleged contemnor proves by a preponderance of the evidence that (A) from the date of the support order through the date of the contempt hearing the alleged contemnor (i) never had the ability to pay more than the amount actually paid and (ii) made reasonable efforts to become or remain employed or otherwise lawfully obtain the funds necessary to make payment, or (B) enforcement by contempt is barred by limitations as to each unpaid spousal or child support payment for which the alleged contemnor does not make the proof set forth in subsection (3)(A) of this section.

(4) Order. Upon a finding of constructive civil contempt for failure to pay spousal or child support, the court shall issue a written order that specifies (A) the amount of the arrearage for which enforcement by contempt is not barred by limitations, (B) any sanction imposed for the contempt, and (C) how the contempt may be purged. If the contemnor does not have the present ability to purge the contempt, the order may include directions that the contemnor make specified payments on the arrearage at future times and perform specified acts to enable the contemnor to comply with the direction to make payments.

*Id.* at 275, 718 A.2d at 228. We determined that, because under Rule 15–207 the defendant must first be afforded the opportunity to show that he has the ability to purge his debt before imprisonment is permitted, the proceedings did not pose an immediate threat of incarceration to the defendant. *Id.* at 275–77, 718 A.2d at 228–29. Accordingly, we held that a personal waiver of the right to the proceedings was not required. *Id.*

In *Zetty v. Piatt,* 365 Md. 141, 776 A.2d 631 (2001), this Court explored whether a constructive civil contempt proceeding implicated Maryland Rule 15–206(e),[14] which enumerates the procedures required for waiver of counsel, when the defendant was found to be in contempt and sentenced to 179 days incarceration. Holding that a personal waiver is required in constructive civil contempt proceedings where incarceration is sought, we emphasized that:

[a] defendant's actual incarceration in a jail, as a result of a proceeding at which he was unrepresented by counsel and did not knowingly and intelligently waive the right to counsel, is fundamentally unfair.

*Id.* at 158, 776 A.2d at 641. Therefore, "it is the fact of incarceration, and not the label placed upon the proceeding," which compels the requirement of a personal waiver. *Id.*

Ms. H. also contends, though, that because CINA adjudicatory proceedings could give rise to separate criminal proceed-

---

**14.** Maryland Rule 15–206(e) provides in pertinent part:

**(e) Waiver of counsel if incarceration is sought.**
(1) Applicability. This section applies if incarceration is sought and applies only to court hearings before a judge.
(2) Appearance in Court Without Counsel.
(A) If the alleged contemnor appears in court without counsel, the court shall make certain that the alleged contemnor has received a copy of the order containing notice of the right to counsel or was advised of the contents of the notice in accordance with Rule 9–208(d);
(B) If the alleged contemnor indicates a desire to waive counsel, the court shall determine, after an examination of the alleged contemnor on the record, that the waiver is knowing and voluntary.

ings against the parent,[15] a colloquy on the record is required to ensure that the parent is waiving her rights voluntarily, knowingly and intelligently.[16] We had the opportunity to explore the character of CINA proceedings *In re John P. and Thomas P.*, 311 Md. 700, 537 A.2d 263 (1988), in which the juvenile court ruled that John P. and Thomas P. were not children in need of assistance and dismissed the case. Counsel for the children asked the court to reconsider, relying on Maryland Rule 916, which allowed for the modification or vacation of a juvenile court order if. it is within the best interests of the child. Ms. P., the mother of the children, opposed the motion on the ground that a retrial would be violative of double jeopardy. We noted that double jeopardy prohibitions only apply to bar criminal prosecutions, and that a CINA proceeding was civil in nature. *Id.* at 707, 537 A.2d at

---

**15.** Ms. H. refers to Maryland Code (1974, 2002 Repl.Vol.), Section 3–828 of the Courts and Judicial Proceedings Article, for support of this assertion, which provides in relevant part:

**Contributing to acts, omissions, or conditions rendering a child in need of assistance.**
(a) *Prohibition.*—An adult may not wilfully contribute to, encourage, cause or tend to cause any act, omission, or condition that renders a child in need of assistance.

\*　\*　\*

(c) *Penalty.*—An adult who violates this section is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $2,500 or imprisonment not exceeding 3 years or both.

**16.** Ms. H. also relies upon *In the Interest of Howard*, 382 So.2d 194 (La.App.1980), *In re Baby Girl Doe*, 149 Ohio App.3d 717, 778 N.E.2d 1053 (2002), and *In re Monique T.*, 2 Cal.App.4th 1372, 4 Cal.Rptr.2d 198 (1992). We do not, however, find these cases persuasive. In *In the Interest of Howard*, the parents of a fourteen-year-old girl were charged with abuse and neglect under a Louisiana criminal law for which the parents could have been incarcerated. Because the proceedings could have resulted in confinement, Louisiana's intermediate appellate court held that the parents had a constitutional right to appointment of counsel, which could only be waived knowingly and intelligently. 382 So.2d at 195.

Furthermore, in both *In re Monique T.*, 2 Cal.App.4th 1372, 4 Cal. Rptr.2d 198 (1992), and *In re Baby Girl Doe*, 149 Ohio App.3d 717, 778 N.E.2d 1053 (2002), there were statutory frameworks requiring personal waiver, which both courts found not to be dispositive. We have no similar statute here.

267. Holding that the second CINA proceeding did not violate double jeopardy, we explained:

> The General Assembly has classified juvenile proceedings as civil and not criminal in nature. Moreover, the legislative intention underlying a CINA proceeding is not to punish the parent; rather, the purpose is to protect the child and provide for his best interests. Additionally, it cannot be said that the potential CINA 'sanctions' are " 'so punitive ... in ... effect as to negate that intention.' "

*Id.* at 709, 537 A.2d at 268 (citations omitted). We further explicated that,

> [w]hile ordinarily a CINA proceeding is not a criminal action against a parent, the Maryland statute does allow the State to seek criminal sanctions against the parent.... Consequently a CINA case does have a criminal aspect to it. Here, however, the State did not seek criminal sanctions against Ms. P. in either the first proceeding or in the subsequent petition for reconsideration. When no sanctions of a criminal nature are sought by the State ... it would seem that the double jeopardy prohibition is inapplicable.

*Id.* at 708, 537 A.2d at 267 (citations and footnote omitted). The State also did not seek criminal sanctions against Ms. H. in the instant case so that a personal waiver of the contested adjudicatory hearing was not necessary.

Ms. H. further asserts that, under the balancing test enumerated by the Supreme Court in *Mathews v. Eldridge,* 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), and employed by this Court in *In re Adoption/Guardianship No. 93321055/CAD,* 344 Md. 458, 491, 687 A.2d 681, 697 (1997), we are compelled to require the stricter standard of waiver to CINA adjudicatory hearings because the State's interest in expediting CINA proceedings pales in comparison to the fundamentally important right of parents to raise their children, and the high risk of erroneous deprivation of that right in proceedings where the parent is forced to make decisions without proper advice by the Court. In *In re Adoption/Guardianship No. 93321055/CAD,* we addressed whether Maryland Code (1984,

1991 Rep. Vol.), Section 5–322(d) of the Family Law Article, which permits parents to waive the right to contest the adoption of their child by failing to file a notice of objection to a petition for guardianship by an enumerated deadline, affords parents sufficient due process of law.[17]  In determining that the due process rights of parents were not offended when the failure to file a timely objection was deemed irrevocable, we emphasized the fairness and adequacy of the notice afforded the parent.  Certainly if the due process rights of parents are not violated by the failure to file a timely notice of objection in termination of parental rights proceedings, their due process rights are not violated when they do not personally waive less intrusive CINA adjudicatory proceedings.

Contrary, then, '  the arguments raised by Ms. H., the stricter standard of waiver requiring the court to conduct a personal colloquy with a parent to establish her or his voluntary, knowing and intelligent waiver ordinarily only has been applied where the rights to be waived have been deemed to be "fundamental," and the proceedings have been those that could result in confinement.  In the present case, Ms. H.'s waiver of a contested CINA adjudicatory hearing was sufficient when her attorney concurred with the stipulated facts.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID BY THE PETITIONER.**

BELL, C.J., Dissents.

---

**17.** Maryland Code (1984, 1991 Repl.Vol.), Section 5–322(d) of the Family Law Article provides in pertinent part:

> (d) *Failure to respond or waiver of notification.*—If a person is notified under this section and fails to file notice of objection within the time stated in the show cause order:
>> (1) The court shall consider the person who is notified to have consented to the adoption or to the guardianship;  and
>> (2) the petition shall be treated in the same manner as a petition to which consent has been given.

Dissenting Opinion by BELL, C.J.

The question posed by Ms. H., the petitioner, in her petition for writ of certiorari is "[w]hether in a CINA proceeding, the right to a contested adjudicatory hearing may be waived only by the parent's personal, knowing, intelligent and voluntary waiver." The majority addresses, and resolves, that issue. In the process, however, it ignores a threshold issue, whose importance and need to be addressed are made strikingly obvious by a colloquy that occurred shortly after the parties, with Ms. H. present, placed on the record the agreement resolving the CINA case. That issue is whether Ms. H., having signed the mediation agreement negotiated between her attorney and Montgomery County ("Department"), continued to agree to it, or, as seems likely, withdrew her agreement after its entry on the record. The meaning of Ms. H.'s statements, and the trial court's obligation to investigate that meaning, ought to be the true focus of our review.[1]

---

1. Under Maryland Rule 8–131(b) we have the discretion to review issues although they were not explicitly raised by the petition for certiorari. *See Simpkins v. Ford Motor Credit Co.*, 389 Md. 426, 435 n. 14, 886 A.2d 126, 131 n. 14 (2005); *State v. Parker*, 334 Md. 576, 596–597, 640 A.2d 1104, 1114 (1994); *see also Brewer v. Brewer*, 386 Md. 183, 191, 872 A.2d 48, 53 (2005). In the case *sub judice*, resolution of an underlying issue is much preferable to resolution strictly on the basis of the petition for certiorari. Rule 8–131(b) provides as follows, in pertinent part:

   "*In Court of Appeals—Additional Limitations.* (1) Prior appellate decision. Unless otherwise provided by the order granting the writ of certiorari, in reviewing a decision rendered by the Court of Special Appeals or by a circuit court acting in an appellate capacity, the Court of Appeals ordinarily will consider only an issue that has been raised in the petition for certiorari or any cross-petition and that has been preserved for review by the Court of Appeals.

   Further, in her brief Ms. H. did argue, though in the context of the waiver of her rights, that she did not understand the proceedings: "As made evident by her plea that the court should "go ahead and do the trial," (App.47), she was under the impression that proceeding by way of a contested hearing was still an option available to her. Indeed, absent any advisement to the contrary, she could not have known or understood that she had foreclosed that avenue."

   In doing so, she implicitly argues that the trial court should have inquired as the meaning of her statements, as those statements may

## I.

A review of the relevant facts makes clear that the issue before us is the existence and nature of Ms. H.'s consent to the CINA proceedings. The Department filed, in the Circuit Court for Montgomery County, a petition requesting that Blessen H. be declared a Child In Need of Assistance ("CINA"). Thereafter, Ms. H., Blessen's mother, Ms. H.'s counsel, counsel for the Department, a social worker with the Department, counsel for Blessen, and Mr. A., Blessen's father, appeared in the Circuit Court for the CINA adjudicatory hearing. As the parties had been unable to schedule a pre-trial hearing, they were offered the opportunity to mediate the matter. All parties agreed to mediation, and the court adjourned while it took place.

Following the mediation, prior to their return to court, the parties and their counsel signed a written Mediated Consent Agreement.[2] Pursuant to that agreement, Blessen would remain committed to the department and in foster care until a home study for her paternal grandparents could be completed by New Jersey Social Services, at which point Ms. C., the paternal grandmother, would obtain custody. Ms. H.'s visitation, supervised by the Department and located at the agency, would occur at least monthly for two or three hours per session.[3] Further, Ms. H. would undergo a mental health evaluation.

The Mediated Consent Agreement was prefaced by the following statement:

---

have indicated her desire to withdraw her consent to the mediation agreement.

**2.** The CINA petition, amended by inserting at the top "Factual Basis for CINA, 9/2/03," was attached to the Mediated Consent Agreement, as the factual basis for the CINA finding.

**3.** The mediated agreement did not specify whether this visitation arrangement applied to Ms. H., Mr. A., or to both. Subsequent discussions on the record, however, indicate that Ms. H.'s supervised visitation was to be monthly, while Mr. A.'s visitation was to be unsupervised and at least weekly.

"Having participated in a mediation session on Sept. 2, 2003, we, the undersigned parties, affirm that the following agreements were reached during the current mediation process. We are satisfied that the provisions of our agreement, as stated, are fair and reasonable, and we agree to abide by and fulfill the agreements we have made this day. We understand our Mediation Agreement is subject to review by the Court and to the extent that the Court has jurisdiction, the provisions of our agreement may be made Orders of the Court."

Ms. H. and Mr. A. signed the agreement, as did counsel for the Department, counsel for Ms. H., and the mediator. Though the form contains a signature line for both the child and the child's counsel, Blessen's court-appointed attorney, neither appears to have signed it.

On their return to court, the parties represented that they had reached an agreement through mediation. The Court was provided with the mediation agreement, to which was attached the original petition with the words "Factual Basis for CINA, 9/2/03" handwritten at the top. After reviewing the documents, suggesting additional language be added to update the document as to Blessen's location and to address an outstanding warrant pertaining to Blessen while she was in Ms. H.'s custody, and leaving "it up to [the Department] to draft some language" to that effect,[4] the Court was advised by counsel, including Ms. H.'s counsel, "that these facts should be sustained and form the basis for a finding of CINA[ ]". In response, the Court ruled:

"All right. I will make such a finding, that based on the agreement of all counsel and parties, because Mr. A. is here without counsel, that the facts alleged are now facts sustained, and that they form a basis for a finding of CINA,

---

**4.** The Department's counsel made the additions requested by the court. Prior to the conclusion of the hearing, she provided them to the court, representing that she had shown them to the other parties, whom, we must presume, agreed to them.

and I will so find, that the child Blessen H. is a child in need of assistance."

It then addressed the recommendations for Blessen's care and visitation, contained in the mediation agreement.

Although not a part of the mediation agreement, the Court next considered a no-contact order, directed to Blessen's maternal grandmother, Ms. G. Ms. H.'s counsel argued that the order prohibiting Ms. G. from contacting the child be lifted and supervised visitation be permitted. The Court refused to accept that recommendation. When called back into the courtroom and advised of that decision, Ms. G. asked to be permitted to explain the behavior alleged to underlie the order. Thereafter, the following colloquy occurred:

"THE COURT: You know, you don't really need to. I don't know whether there are criminal charges still pending or not.

"MS. GARNETT: She did it, the mother.

"THE COURT: If you don't go there anyway, then it doesn't matter if I say no contact with the child until further court order. But that's what it's going to say.

"MS. H.: I can't deal with this. It's so many lies on this place. It's just ridiculous.

"MS. CARTER: Shhh.

"MS. H.: It really is. You know. I'm trying to be the best parent I can be. I have already been slandered by DHS. Sheldon don't like some of this. And I have swallowed my pride to try to get this court hearing done. Okay. I don't deserve this. I've been the best mother I can be. I have listened to you, Your Honor, have saying things to me, and you haven't even asked me about my own character. You haven't even asked me—

"THE COURT: Asked you about your own what?

"MS. H.: My own character. How did I end up in this situation. Why was I traveling? Why was my child not in a stable home? Some of these things are not—

"THE COURT: Well, you have an attorney, ma'am, and I was listening to your attorney.

"MS. H.: I can't speak no more, Your Honor. I really can't.

"THE COURT: Well, then, don't.

"MS. H.: You can go ahead and do the trial. I need to sit outside.

"THE COURT: Well, there isn't any trial. This is finished. I just wanted to explain to Ms. G. what I had arrived at. So, the order will generate as I just said.

"MS CARTER: Your Honor, can I speak to my client outside, please.

"THE COURT: Sure. Do we have a good address on everybody? Do we have a six month?

"THE CLERK: I have a date, Your Honor.

"THE COURT: What is the date?

"THE CLERK: March 9, 2004 at 8:30, Courtroom 18.

"THE COURT: March 9, this courtroom.

"MS. G.: I will respect your decision, Judge.

"THE COURT: Thank you, Ms. G. Do we have your address, so I can send you a copy of the order?

"MS. G: ＿＿ A ＿＿ H ＿＿ Way.

"THE COURT: Wait. My law clerk will hand it down to you.

"MS. G: I think Ms. Rogers has it. Don't you Ms. Rogers?

"MS ROGERS: I do have it. I can provide it to the Court.

"THE COURT: Okay. That's fine.

(Whereupon the hearing was concluded.)"

Three days after the hearing, the Adjudication and Disposition Order, reflecting the agreement orally discussed in court, was filed.[5] The docket entries for that day state that an

---

**5.** The Mediated Consent Agreement was less detailed than both the discussion in court and the Order issued by the court. The Order, after stating that Blessen's status as a CINA had been proven by a preponderance of the evidence, in pertinent part:

"ORDERED that the Respondent Child, Blessen H., shall:

adjudication order, finding certain facts were sustained, was entered, as was an order for commitment/care/custody to the Department. The docket entries for the day of the hearing indicate that the Mediated Consent Agreement was filed, the case was called for an adjudicatory hearing, an agreement was placed on the record, the court "[found] the facts sustained," a disposition hearing was held, Blessen was found to be a CINA, the court placed Blessen with a relative, and a review hearing date was set. Thus, both the docket entries and the filing date stamped on the Order make clear that the Order, although signed earlier, was not actually filed until September 5, 2003, three days after the hearing.

----

"1. be committed to the Montgomery County Department of Health and Human Services and under the jurisdiction of the Court;

"2. be placed in foster care, pending an Interstate Compact Home Study for the Respondent's paternal grandmother, Leatha C.;

"3. be placed in the home of her paternal grandmother once the home study is completed and approved;

"4. have supervised visitation with her father, Sheldon A., minimum weekly, until such time that the Respondent moves to New Jersey, then visitation shall be liberal and unsupervised;

"5. have supervised visitation with her mother, Tynetta H., minimum monthly (minimum three hours a day if she visits once a month; and two hours a day if she visits twice a month) and under the direction of the Department;

"6. have NO CONTACT with her maternal grandmother, Rose G., until further Court order, and it is further

"ORDERED that the Respondent's father, Sheldon A. shall:

"1. bring the Respondent Child to Maryland for visitation with her mother;

"2. participate in and complete parenting classes, and it is further

"ORDERED that the Respondent's mother, Tynetta H., shall:

"1. give the Montgomery County Department of Health and Human Services seven to ten days notice of visitation;

"2. participate in a mental health evaluation and follow all recommendations of the evaluation;

"3. participate in and complete parenting classes . . ."

It was dated the date of the hearing.

The court order differed from the Mediated Consent Agreement in that it specified the visitation arrangements as applied to each parent, required both parents to attend parenting classes, and maintained a no contact order between Blessen and Ms. G. As we have seen, the parties appeared to agree in open court to the details of visitation and to parenting classes. It is clear, on the other hand, that Ms. H. did not agree to the no-contact order placed upon her mother. Consequently, the no-contact order was purely an order of the court.

## II.

"A consent judgment or consent order is an agreement of the parties with respect to the resolution of the issues in the case or in settlement of the case, that has been embodied in a court order and entered by the court, thus evidencing its acceptance by the court." *Long v. State*, 371 Md. 72, 82, 807 A.2d 1, 6–7 (2002), citing *Jones v. Hubbard*, 356 Md. 513, 529, 740 A.2d 1004, 1013 (1999) and *Chernick v. Chernick*, 327 Md. 470, 478, 610 A.2d 770, 774 (1992). "Consent judgments are hybrids, having attributes of both contracts and judicial decrees," *Long*, 371 Md. at 82, 807 A.2d at 7; however, "this Court has repeatedly held that 'consent judgments should normally be given the same force and effect as any other judgment, including judgments rendered after litigation.' " *Id.*, citing *Jones*, 356 Md. at 532, 740 A.2d at 1014. As the United States Supreme Court has explained:

"Consent decrees are entered into by parties to a case after careful negotiation has produced agreement on their precise terms. The parties waive their right to litigate the issues involved in the case and thus save themselves the time, expense, and inevitable risk of litigation. Naturally, the agreement reached normally embodies a compromise ..."

*United States v. Armour & Co.*, 402 U.S. 673, 681–82, 91 S.Ct. 1752, 1757, 29 L.Ed.2d 256, 263 (1971).[6]

Maryland Rule 2–601 sets forth the method by which a judgment is entered and becomes final.[7] We have previously stated that, in accordance with Rule 2–601 and Rule 1–202(n),

---

6. We have also stated that a consent agreement, or settlement agreement, is a contract between two parties which is conditioned upon the court's acceptance of its terms. *Chernick v. Chernick*, 327 Md. 470, 479, 610 A.2d 770, 774 (1992). This is consistent with the understanding of the parties to this case, for, as previously noted, the mediation agreement was prefaced, in part, with the statement: "we understand our Mediation Agreement is subject to review by the Court and to the extent that the Court has jurisdiction, the provisions of our agreement may be made Orders of the Court."

7. Maryland Rule 2–601 reads as follows:

" 'two acts must occur for an action by a court to be deemed the granting of a judgment: the court must render a final order and the order must be entered on the docket by the clerk.' Once both steps have occurred, rendition and entry, a judgment has been created. 'Rendition of judgment is ... the court's pronouncement, by spoken word in open court or by written order filed with the clerk, of its decision upon the matter submitted to it for adjudication.' The *entry* of a judgment is the 'purely ministerial act' of placing a judgment in the permanent record of a court.

"Whether a judgment has been rendered is a determination that must be made on a case by case basis and that 'turns on whether the court indicated clearly that it had fully adjudicated the issue submitted and had reached a final decision on the matter at that time.' A reviewing court will focus on the words spoken and the actions taken in the lower court to make such a determination."

*Board of Liquor License Com'rs for Balt. City v. Fells Point Café*, 344 Md. 120, 127–128, 685 A.2d 772, 775–776 (1996)

---

"(a) Prompt entry—Separate document. Each judgment shall be set forth on a separate document. Upon a verdict of a jury or a decision by the court allowing recovery only of costs or a specified amount of money or denying all relief, the clerk shall forthwith prepare, sign, and enter the judgment, unless the court orders otherwise. Upon a verdict of a jury or a decision by the court granting other relief, the court shall promptly review the form of the judgment presented and, if approved, sign it, and the clerk shall forthwith enter the judgment as approved and signed. A judgment is effective only when so set forth and when entered as provided in section (b) of this Rule. Unless the court orders otherwise, entry of the judgment shall not be delayed pending determination of the amount of costs.

"(b) Method of entry—Date of judgment. The clerk shall enter a judgment by making a record of it in writing on the file jacket, or on a docket within the file, or in a docket book, according to the practice of each court, and shall record the actual date of the entry. That date shall be the date of the judgment.

"(c) Recording and indexing. Promptly after entry, the clerk shall (1) record and index the judgment, except a judgment denying all relief without costs, in the judgment records of the court and (2) note on the docket the date the clerk sent copies of the judgment in accordance with Rule 1–324."

The term "judgment" is defined by Maryland Rule 1–202(n) as "any order of court final in its nature entered pursuant to these rules."

(citations omitted), citing *Davis v. Davis*, 335 Md. 699, 646 A.2d 365 (1994). When, as here, a court indicates that its written opinion or oral remarks, made from the bench, are to be followed by a written order, the final judgment occurs upon the signing and filing of the written order unless the court subsequently decides not to issue a written order, instead directing judgment in some other way, or unless the written order is collateral to the judgment. *Rohrbeck v. Rohrbeck*, 318 Md. 28, 41–42, 566 A.2d 767, 774 (1989). It is clear that, in the present case, a written order was contemplated: the court stated "the order will generate as I just said" and set about collecting addresses "so I can send you a copy of the order[ ]."

In the case *sub judice*, and, pursuant to the aforementioned principles of law, the oral agreement submitted in open court on September 2, 2003 was, in part, a consent judgment, *i.e.* with regard to Blessen's status as CINA, her custody, both parents' visitation rights, Ms. H.'s mental health evaluation, and both parties' obligation to attend parenting classes, and, in part, a "pure" court order, *i.e.* with respect to the no-contact order. This Order did not become a final judgment, pursuant to Rule 2–601, however, until September 5, 2003, when it was filed with the clerk and entered on the docket. This is so because, as is clear from the final remarks made during the September 2 hearing, the court contemplated writing and filing a written order based on its oral findings and the mediated agreement between the parties.

It is clear from Ms. H.'s comments that, at the very least, she either did not fully understand either the consequences, or the extent, of the agreement to which she had assented and which the court had outlined during the hearing, or that she may no longer have been satisfied with it. She stated:

"I can't deal with this. It's so many lies on this place. It's just ridiculous ... It really is. You know. I'm trying to be the best parent I can be. I have already been slandered by DHS. Sheldon don't like some of this. And I have swallowed my pride to try to get this court hearing done. Okay. I don't deserve this. I've been the best mother I can be."

She went on to chide the court that it had not asked her about her "own character," or the reasons why she had not maintained a stable home for Blessen. When the Court indicated its deference to her counsel, whom it thought was speaking for her, she concluded: "I can't speak no more, Your Honor. I really can't," adding that the court could proceed with "the trial" while she remained outside of the courtroom. This was said despite the fact that it was clear from the proceedings, and especially the mediation agreement, that there would be no trial; Ms. H.'s agreement to Blessen's CINA status via that agreement meant that there was nothing, aside from Blessen's placement, the parents' visitation and services to be provided to them by the Department, and Ms. G.'s access to the child, to be resolved. Although Ms. H.'s counsel requested time to speak with her outside of the courtroom, and although the Court granted that request, the hearing was concluded shortly thereafter, after the social worker had given the clerk a copy of the mediation agreement and the Court had indicated that a final order would be issued, presumably by mail.

Because Ms. H. made the aforementioned, at best ambiguous, statements prior to the entry of judgment, albeit after the consent had been tendered and the court had indicated its intent to accept it, the Court had an obligation to question her further as to their meaning. More specifically, given the circumstances and the seriousness of the issue, it should have ascertained whether, in view of their ambiguity, the statements were an expression of her intent to withdraw her consent to the CINA finding.

In *Chernick v. Chernick,* 327 Md. 470, 610 A.2d 770 (1992), we considered whether, and when, a party could withdraw consent to a consent agreement. In *Chernick,* Mr. and Ms. Chernick entered into, and signed, an agreement resolving all matters concerning their divorce. *Id.* at 474, 610 A.2d at 771–772. Pursuant to that agreement, the parties cancelled their trial date, *id.,* and mailed a copy of the agreement, as a proposed consent order, to the clerk, who filed it without first obtaining a judge's signature. *Id.* at 474–475, 610 A.2d at

771–772. Approximately two weeks later, Ms. Chernick's attorney filed a line stating that she had withdrawn her consent to the proposed consent order. *Id.* at 474–475, 610 A.2d at 772. We concluded that the proposed consent order was actually a proposed consent judgment, *id.* at 478, 610 A.2d at 773, and acknowledged that "entry of a judgment by consent implies that the terms and conditions have been agreed upon and consent thereto given in open court or by filed stipulation." *Id.* at 484, 610 A.2d at 776. We held, however, that because both Chernicks had agreed, and consented to, the terms of the order at the time that it was filed with the clerk, Ms. Chernick could not subsequently withdraw her consent, even though it had not been signed by the court when she sought to do so. *Id.* at 484, 610 A.2d at 777.[8]

Similarly, in *Dorsey v. Wroten,* 35 Md.App. 359, 370 A.2d 577 (1977), which we cited approvingly in *Chernick,* 327 Md. at 483–484, 610 A.2d at 776, the parties agreed to mediate their dispute. *Dorsey,* 35 Md.App. at 360, 370 A.2d at 578. Having reached a successful resolution, they communicated that fact to the trial court, *id.* at 360, 370 A.2d at 579, who asked counsel to prepare a consent decree and present it to the court for signature. *Id.* Several hours later, prior to the presentment of the decree, Dorsey informed his attorney that he no longer assented to the settlement agreement, and his attorney met with the trial judge and advised him accordingly. *Id.* at 360–361, 370 A.2d at 579. "The trial judge stated that he considered the matter settled and that he would sign the 'consent' decree when it was presented," and, in fact, did so. *Id.* at 361, 370 A.2d at 579. The Court of Special Appeals held that, although Dorsey had orally agreed to a settlement, "it is obvious that he withdrew that consent before the final meeting

---

**8.** Our actual holding was limited as follows: "Once a consent judgment is agreed to by the parties, executed by the parties or their authorized agents, filed with the court, and the case is taken off the trial calendar, the court may sign that consent order. The fact that one of the parties may have changed his or her mind shortly before or shortly after the submitted consent order was signed by the court does not invalidate the signed consent judgment." *Chernick,* 327 Md. at 484, 610 A.2d at 777.

with the trial judge. It is also apparent that both the trial judge and the appellees had full knowledge that the appellant was not consenting to the decree two days before it was signed." *Id.* at 362, 370 A.2d at 579. Accordingly, the judgment was reversed. *Id.* The court also noted, as we had indicated in *Chernick,* 327 Md. at 483–484, 610 A.2d at 776, that "by its nature ... a consent decree cannot be entered unless both parties agree to the order which is presented to the clerk." *Id.* at 362 n. 1, 370 A.2d at 579 n. 1.

These cases, together with Rule 2–601, indicate that if the statements Ms. H. made in open court were sufficient to indicate an intention to withdraw her consent to the mediation agreement and, in fact, she did so, the withdrawal would have occurred prior to judgment being issued in the case. Since a consent decree cannot be entered unless both parties agree to its terms, the consent order would be invalid.[9] On this record, it is not clear whether Ms. H. intended to withdraw her consent. Her statements were so ambiguous that the trial court should have been prompted to, upon hearing them, inquire further—to, through direct questioning, ascertain the meaning of her statements and to determine her intent. Specifically, the court should have inquired as to whether she was still agreeing to the facts in the CINA petition and intended to remain bound by the mediation agreement.

*Commercial Carrier Corp. v. Guevara,* 541 So.2d 774 (Fla. App.1989) is instructive. In that case, the appellee had filed a six-point counterclaim in response to appellant's original complaint, Count III of which alleged a statutory violation that, if proven, would have allowed the appellee to collect attorney's

---

**9.** We would certainly not be the only Court to so hold. *See Woods v. Woods,* 167 S.W.3d 932 (Tex.App.2005) (consent must exist at the time judgment is rendered in order to be valid, and an oral order is not a judgment if there is an intent to enter judgment in the future); *Williamson v. Williamson,* 224 N.C. 474, 31 S.E.2d 367 (1944) ("consent of the parties must still subsist at the time the court is called upon to exercise its jurisdiction and sign the consent judgment"); *Lee v. Rhodes,* 227 N.C. 240, 41 S.E.2d 747 (same); *Jacobs v. Steinbrink,* 242 App.Div. 197, 273 N.Y.S. 498 (1934) (consent may be withdrawn at any time prior to entry of judgment).

fees. *Id.* at 774. The appellant "made an offer of judgment to appellee," pursuant to which judgment on the counterclaim, not to include attorney's fees, would be entered against the appellant. *Id.* The offer was accepted by the appellee, who, when giving notice of acceptance, stated that it did not include Count III of the counterclaim. *Id.* Subsequently, the appellant filed a written objection to the entry of any judgment on the offer and acceptance "on the grounds that no additional entitlement by way of attorney fees was contemplated by the parties." *Id.* The trial court entered judgment over the appellant's objection. *Id.* On appeal, the District Court of Appeal of Florida, Third Circuit, reversed. It held: "it was an abuse of discretion by the trial judge to fail to disapprove the offer and acceptance when confronted by a clear and certain expression of the parties' lack of understanding as to what was intended by the offer." *Id.*

Similarly, in *Burnaman v. Heaton,* 150 Tex. 333, 240 S.W.2d 288 (1951), the parties announced in court that they had settled their case. *Id.* at 335, 240 S.W.2d at 289. Later that same day, the trial judge made a notation on the docket reflecting the fact of settlement, not the amount, but only after the plaintiff's attorney had obtained "confirmation of the notation from the attorney for the defendants." *Id.* at 335, 240 S.W.2d at 289–290.

The trial judge having been advised by a clerk that the plaintiff was "trying to back out on the settlement," *id.* at 336, 240 S.W.2d at 290, the attorneys for both parties appeared in court and again announced their settlement. *Id.* This was entered on the docket, *id.;* however, judgment was not entered at that time.

One week later, the trial judge received a letter from the plaintiff, in which she stated that she did not authorize the settlement. *Id.* Following a hearing to consider whether judgment should be entered, the plaintiff having been required to show cause why not and the defendant having filed a motion to enter judgment, the trial judge entered judgment as the

defendant had requested and over the plaintiff's objection. *Id.* at 336, 240 S.W.2d at 290.

On appeal, the Texas Supreme Court determined that the trial court should not have accepted the settlement because "the announcement of settlement and docket entry were made after the court had received information that the plaintiff was dissatisfied . . . the record reveals that she was opposed to the settlement and is still insisting upon her right to be heard upon the merits of her claim." *Id.,* at 336–337, 240 S.W.2d at 290. As the judgment entered was a consent judgment, consent was required at the "very moment" the court made the agreement the judgment of the court. *Id.* at 338, 240 S.W.2d at 291. It further stated:

"When a trial court has knowledge that one of the parties to a suit does not consent to a judgment agreed to by his attorney, the trial court should refuse to give the agreement the sanction of the court so as to make it the judgment of the court. Any judgment rendered on the agreement under such circumstances will be set aside. The same reasons which impel the setting aside of a consent judgment rendered by the court with knowledge that a party does not consent thereto will, in the interest of justice, also impel the setting aside of a consent judgment rendered when the court is in possession of information which is reasonably calculated to prompt the court to make further inquiry into the party's consent thereto, which inquiry, if reasonably pursued, would disclose the want of consent . . .

"We think the information in the possession of the court was clearly sufficient and of such a nature as to put the court on notice that plaintiff's consent to the judgment rendered on March 23rd might be wanting and to require the court to make further inquiry before rendering judgment."

*Id.* at 339–340, 240 S.W.2d at 291–292 (citations omitted). *See also Cureton v. Robbins,* 319 S.W.2d 735, 737 (Tex.Civ.App. 1958); *Gregory v. White,* 604 S.W.2d 402, 403 (Tex.Civ.App. 1980); *Trevathan v. Akins,* 712 S.W.2d 559, 560 (Tex.App. 1986).

Ms. H.'s statements in open court clearly demonstrate a lack of understanding of the proceedings, of the mediation agreement, or of both, and, possibly, a desire to withdraw her consent to the CINA finding. Accordingly, and consistent with the nature of a consent judgment, in which consent must be present at the very moment the judgment is entered, the trial court had a duty to question her further as to the meaning of her statements and her intention, and to determine whether she still continued to consent to the CINA finding.

Accordingly, I would reverse the Court of Special Appeals and remand for further proceedings.